UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

KEVIN JAMES LISLE,

Petitioner,

v.

WILLIAM REUBART, *et al.*,

Respondents.

Case No. 2:03-cv-01006-MMD-DJA

ORDER

## I.   SUMMARY

This action is a petition for a writ of habeas corpus by Kevin James Lisle, an individual incarcerated at Nevada's Ely State Prison who is sentenced to death. The case is fully briefed and before the Court for adjudication of the merits of the claims remaining in Lisle's fourth amended habeas petition (ECF No. 292). The Court will deny Lisle's petition and grant Lisle a certificate of appealability as to Claim 16A.

## II.   BACKGROUND

This habeas corpus action is brought under 28 U.S.C. § 2254. Lisle's conviction and death sentence, at issue in this case, are for the murder of Justin Lusch in Las Vegas on August 22, 1994. In its opinion on Lisle's direct appeal, the Nevada Supreme Court described the factual background of the case as follows:

On August 22, 1994, between 4:00 to 4:30 a.m., the body of nineteen-year-old Justin Lusch ("Justin") was found shot to death in the Lone Mountain desert area in Las Vegas.

* * *

In early July 1994, Justin began living with a friend, Eric Resma ("Resma") in Resma's converted garage, which was a known "drug house." About August 8, 1994, two weeks prior to Justin's death, Lisle and [Jerry] Lopez visited Resma's

garage for the first time, looking for their friend, Jason Sullivan ("Sullivan"), who had recently lived there, but had since moved out. Resma talked with Lisle and Lopez and invited them inside to ingest drugs. From that day forward, Lisle and Lopez continued to frequent Resma's residence. At some point thereafter, Resma found a .380 caliber automatic gun between his couch cushions. When Resma asked the occupants of the garage where it came from, either Lisle or Lopez took the gun from Resma and put it in his own pants waistband.

On August 17, 1994, Lisle and Sullivan participated in a drug transaction at Resma's house. Lisle sold Sullivan ten grams of methamphetamine with the understanding that Sullivan would pay Lisle for the narcotics within a few days. Sullivan then sold Justin 1.75 grams for which Justin would pay later. Sullivan took his portion of the drugs, along with five or six rifles he also presumably received from Lisle, to the house of his girlfriend, Nicole Catherina ("Catherina"), where Sullivan was then living. Later that day, Sullivan was arrested on unrelated charges.

The next day, on August 18, 1994, Catherina contacted Resma so that she could return the drugs and guns to Lisle. Resma and Justin went to Catherina's residence to pick up the items and took them to Resma's house where Lisle and Lopez were waiting. Resma gave the drugs to Lisle, but put the rifles, wrapped in a blanket, on the couch. Justin told Lisle that Sullivan had given him a portion of the drugs, and Lisle demanded to know their location. Justin replied that the drugs were locked away and he did not have them in his possession at the moment. Lisle continued to demand to see the drugs. He appeared very upset and seemed to disbelieve Justin. Resma then stated that he had the drugs and asked Lisle if he wanted to see them. Lisle calmed down once Resma interjected; Lisle stated that he did not need to see the drugs.

Throughout this conversation, Lisle was "fiddling" with his .380 caliber weapon. He was cleaning it, and the clip containing ammunition was not in the gun. Nevertheless, Justin asked Lisle if he was threatening him with the gun. Lisle said he was not; if he had a problem with Justin, he would take him outside and they would box.

Later that day, Justin separately told his friends, Ryan Cizl ("Cizl") and Jeff Kurtz ("Kurtz"), that Lisle had held a gun to his head. He also told them that later Lisle apologized to Justin. Both Kurtz and Cizl testified at trial that although Justin was prone to exaggerate, this time they did not detect any hyperbole from him.

Sometime between August 18, 1994, and August 21, 1994, Justin found the rifles that were returned at Resma's residence. [Footnote: It is unclear from the record how Justin "found" these rifles when he participated in obtaining them from Catherina to return to Lisle. Presumably, since the rifles were wrapped in a blanket, Justin did not know what they were.] He thought they were stolen and stated that he wanted the guns removed from the residence or else he would turn them over to his father, the chief of police for North Las Vegas. Thereafter, another resident at Resma's garage, T.J. Willis ("Willis"), told Lisle what Justin had said about the guns. Lisle apparently stated to Willis that he advised Justin not to do that.

On August 21, 1994, in the late evening hours, Lisle, Lopez, and some other friends, including Adam Evans ("Evans"), were at the house of Anthony Vanella

2

("Vanella"). Lisle stated, in Evans' presence, that he was going to kill a "snitch" named Justin. Lopez was not present at this conversation.

In the meantime, at approximately 10:30 p.m., Kurtz telephoned Justin to request that Justin procure some drugs for him. Between 11 p.m. to midnight, Justin gave another friend a ride home from Resma's garage. While Justin was out, Kurtz called back again and left a message. When Justin returned home, he did not call Kurtz back right away.

At approximately 2 a.m. on August 22, 1994, Lisle and Lopez left Vanella's house. Either Lopez or Lisle had a .380 caliber gun tucked into his waistband.

At approximately 2:30 a.m., Justin returned Kurtz's phone call to inform him that he was going out to get the drugs. Justin stated that he was on his way out the door at that moment and he would contact Kurtz in fifteen minutes. He stated he was getting the drugs from some people known as "Vatos" and that they were at the door right now. Lisle and Lopez were known as "Vatos," and Justin, in particular, enjoyed calling them by that nickname. Kurtz, who was anxiously awaiting his delivery, called Justin again at 3 a.m. and received no answer.

Between approximately 4:00 to 4:30 a.m., Justin's body was found at an area in the desert known as Lone Mountain. It was later determined that this was an area that Lisle and Lopez were known to frequent for shooting practice. Justin was shot three times: once in the upper chest, once in the right side of his back, and once in his lower back.

Meanwhile, between 4:00 to 4:30 a.m., Lisle and Lopez returned to Vanella's house. Lisle had the gun in his possession. Evans testified that Lisle told Vanella, "I smoked him. I got him. I killed a snitch. We took him to where we used to shoot and he ran and I shot him in the back." In addition, Vanella's mother overheard Lisle say, "I took him to the desert and I did him. I shot him four times and I think I hit him three. He was a rat. I knew he was a rat and I'm glad I did it." Lisle also mentioned the "snitch's" name was Justin. Lopez then stated, "We did it clean and we did it good. Nobody is going to find out that we did it. You don't have to worry."

Vanella then suggested to Lisle and Lopez to get rid of the gun, whereupon Lisle stated that he would go out and sell it. Lisle and Lopez then left Vanella's house and returned about one hour later. Lisle stated he sold the gun for $50.00.

Later on August 22, 1994, between 9 or 10 p.m., Vanella brought Lisle and Lopez to the house of Larry Prince ("Prince") for the first time. [Footnote: Prince was a man in his late forties who provided food, drugs, money, and a place to stay for teenagers and young adults in the neighborhood.] Lisle, Vanella, and Prince discussed a drug transaction. At the conclusion of this conversation, Lisle asked Vanella to leave the room. When Prince and Lisle were alone, Lisle stated, "There's something I have to let you know. I killed a snake. I mean I offed a snitch, I offed someone. I offed a human being. I killed someone." He then stated the victim was a son of a police officer, but did not name him. Lisle did, however, state that it would be on the news that evening. At 11 p.m., they all watched the news. Upon seeing a story of a body found in the desert, Lisle seemed to display a sense of satisfaction, while Lopez portrayed no reaction at all.

3

The next day, August 23, 1994, Prince assisted Lisle and Lopez in disposing of a trash bag that purportedly contained two pairs of tennis shoes. Evans testified that within a couple days after the murder, he noticed that Lisle and Lopez wore different tennis shoes than they had worn prior to Justin's death.

Sometime between August 22, 1994, and August 25, 1994, Lisle showed Prince a .380 caliber automatic gun, but explained that this was not the weapon used to kill Justin. Lisle stated, "Don't worry about that one. That one's long gone."

On August 25, 1994, the police arrested Prince at his home for possession of a controlled substance with intent to sell. While there, the police observed Lisle sitting in a certain armchair. Later that day, upon searching Prince's house pursuant to a search warrant, the police found a .380 caliber gun tucked into the seat cushions of the very chair on which Lisle had been sitting. Although this gun was later determined not to be the same weapon that killed Justin, it was discovered that the brand of bullets found in the gun was the same brand used to shoot Justin.

In late August 1994, Lisle informed his friend, John Melcher ("Melcher"), that he was "laying low" because the police were trying to "get" him for the murder of the North Las Vegas police chief's son, but that the police did not have enough evidence on him.

Lisle introduced Melcher to Lopez. Lopez told Melcher that he and Lisle picked up Justin and took him to the desert. Lopez stopped the car, and Lisle and Justin got out and went to the back of the car, whereupon Lopez observed Lisle shoot Justin. Lopez was able to witness this incident by looking at the rear-view mirror.

On October 22, 1994, Lisle, Melcher, and Evans were involved in the murder of Kip Logan ("Logan"). Lisle was eventually convicted of first degree murder and sentenced to death. [Footnote: Lisle was apparently sitting in the passenger's seat of a van while Melcher was driving it on the freeway. Evans was sitting in the back seat behind Lisle. Lisle was making gang hand signals and yelling at the cars that passed them on the right side. Logan was a driver of a car next to them, who started to laugh at Lisle. Lisle pulled out a gun and shot Logan, killing him.]

Melcher and Evans eventually agreed to a plea bargain for their participation in Logan's death in exchange for testifying against Lisle for the killing of both Logan and Justin. In addition, Prince plea bargained the August 25, 1994 drug charges pending against him in exchange for testifying at both murder trials.

In early 1995, while Melcher and Lisle were incarcerated together because of the Logan murder, Lisle told Melcher that he looked Justin in the eyes before he killed him and that he got a thrill from it.

In July 1995, Lisle and Lopez were arrested for Justin's murder, and on July 28, 1995, an information was filed charging Lisle and Lopez each with murder with use of a deadly weapon and conspiracy to commit murder. In addition, Lisle was charged with being an ex-felon in possession of a firearm.

4

Trial began on April 9, 1996, and concluded on April 18, 1996, resulting in verdicts of first degree murder with use of a deadly weapon and conspiracy to commit murder for both Lisle and Lopez. Lisle was also found guilty of being an ex-felon in possession of a firearm. The penalty hearing began April 22, 1996, and concluded on April 25, 1996, resulting in a sentence of death for Lisle and a sentence of life in prison with the possibility of parole for Lopez.

*Lisle v. State*, 941 P.2d 459, 463-65 (Nev. 1997) (order filed at ECF No. 187-4).

In a separate case, Case No. 2:03-cv-1005-JCM-DJA in this Court, Lisle sought relief with respect to his conviction and death sentence for the Logan murder. Lisle has been denied habeas corpus relief in that case, and Lisle has appealed. The Logan murder occurred after the Lusch murder, but Lisle was tried for the Logan murder before he was tried for the Lusch murder.

In this case, regarding the Lusch murder, the judgment of conviction was entered on June 7, 1996. (ECF No. 186-15.) Lisle appealed to the Nevada Supreme Court, and the Nevada Supreme Court affirmed on June 17, 1997. *See Lisle*, 941 P.2d at 477. The Nevada Supreme Court denied Lisle's petition for rehearing. (ECF No. 187-7.) Lisle petitioned to the United States Supreme Court for certiorari, and that petition was denied on October 5, 1998. (ECF No. 187-11.)

Lisle filed a *pro se* petition for writ of habeas corpus in the state district court on November 12, 1998. (ECF No. 187-14.) Counsel was appointed, and, with counsel, Lisle filed a supplement to his petition. (ECF No. 187-22.) The state district court denied the petition. (ECF No. 187-26.) Lisle appealed, and the Nevada Supreme Court affirmed on July 9, 2002. (ECF No. 188-5.)

Lisle initiated this action by filing a petition for writ of habeas corpus in this Court on August 20, 2003. (ECF No. 1.) The Court appointed the Federal Public Defender for the District of Nevada (FPD) to represent Lisle. (ECF Nos. 5, 13, 15.) Lisle then filed a motion for leave to conduct discovery (ECF No. 47), and extensive discovery proceedings ensued. On May 20, 2008, Lisle filed a first amended habeas petition. (ECF No. 72.)

5

On July 7, 2008, Lisle filed a motion to stay this case while he pursued certain claims in state court. (ECF No. 78.) Respondents did not oppose that motion, and on August 4, 2008, this case was stayed. (ECF No. 81.)

On October 3, 2008, Lisle filed a second state habeas petition. (ECF Nos. 189-1, 189-2, 189-3, 190-1, 190-2, 190-3, 190-4.) The state district court dismissed that petition on procedural grounds. (ECF No. 192-4.) Lisle appealed, and the Nevada Supreme Court affirmed on February 24, 2012. (ECF No. 193-4.)

The stay of this case was lifted on December 12, 2012. (ECF No. 119.) On March 25, 2013, Lisle filed a second amended petition for writ of habeas corpus (ECF No. 129), and on April 28, 2014, Lisle filed a third amended petition (ECF No. 176).

Respondents filed a motion to dismiss Lisle's third amended habeas petition on December 26, 2014. (ECF No. 182.) Lisle's counsel—the FPD—then filed an ex parte motion to withdraw (ECF No. 213 (Sealed)), informing the Court that they had a conflict with respect to a potential argument for equitable tolling in response to Respondents' assertion of the statute of limitations defense. The Court ultimately denied the FPD's motion to withdraw but appointed separate counsel to assert the equitable tolling argument for Lisle. (ECF Nos. 225 (Sealed), 231 (Sealed), 233.) Lisle's separate counsel filed supplemental memoranda in response to the motion to dismiss. (ECF Nos. 240, 262.)

While the motion to dismiss the third amended petition was pending, Lisle filed a motion for leave to supplement his petition. (ECF No. 268.) The Court granted that motion and directed Lisle to file a fourth amended petition including the new material. (ECF No. 284.) The Court denied the motion to dismiss the third amended petition, without prejudice, as moot.

On April 21, 2017, Lisle filed his fourth amended petition (ECF No. 292), the operative petition in this action, asserting the following claims:

6

1.      Lisle's federal constitutional rights were violated as a result of ineffective assistance of counsel.

     A.      Trial counsel were ineffective for failing to present available mitigating evidence at the penalty phase of Lisle's trial.

     B.      Trial counsel were ineffective at the guilt phase of Lisle's trial.

     C.      Lisle's federal constitutional rights were violated as a result of the cumulative effect of ineffective assistance of his counsel.

     D.      Lisle received ineffective assistance of counsel on his direct appeal and in his state post-conviction proceedings.

2.      Lisle's death sentence is in violation of the federal constitution, because "the statutory aggravating factors could not be applied constitutionally to make Mr. Lisle death-eligible."

     A.      "The kidnapping aggravating circumstance is unconstitutional as applied to Mr. Lisle."

     B.      "The 'previously convicted of another murder' aggravator is unconstitutional as applied to Mr. Lisle."

     C.      "Counsel at all proceedings failed to raise the unconstitutionality of the aggravating factors applied at the Lusch proceedings."

3.      Lisle's federal constitutional rights were violated, in the guilt phase of his trial, as a result of the admission of evidence of other bad acts by Lisle.

     A.      Lisle's federal constitutional rights were violated as a result of admission of evidence regarding the Logan homicide.

     B.      Lisle's federal constitutional rights were violated as a result of admission of evidence "that Melcher was an 'enforcer' for Lisle."

4.      Lisle's federal constitutional rights were violated "because the trial court admitted prejudicial extrajudicial statements of Mr. Lisle's co-defendant Jerry Lopez."

5.      Lisle's federal constitutional rights were violated "because the trial court's instruction to Larry Prince to testify falsely corroded judicial integrity and rendered Mr. Lisle's proceedings fundamentally unfair."

6.     Lisle's federal constitutional rights were violated "because the trial court's striking of Janice Sykes's references to Jerry Lopez deprived Mr. Lisle of an opportunity to present mitigating evidence."

7.     Lisle's federal constitutional rights were violated "because trial court error and the ineffective assistance of counsel during voir dire contaminated Mr. Lisle's proceedings."

      A.    "Mr. Lisle's jury was death-biased."

      B.    "A death-biased juror was seated."

      C.    "The trial court erroneously denied trial counsel's motion for a sequestered jury."

      D.    "The errors in the voir dire process should be considered singly and cumulatively."

      E.    Lisle's counsel on direct appeal and in his state post-conviction proceedings "failed to investigate, develop, and present this claim."

8.     Lisle's federal constitutional rights were violated "because prosecutorial misconduct deprived Mr. Lisle of fundamentally fair proceedings."

      A.    "The State improperly expressed personal opinions during closing arguments."

      B.    "The State improperly commented on the lack of mitigating evidence and the role of mitigating circumstances."

         1.    "The State made improper comments regarding Mr. Lisle's mitigation presentation."

         2.    "The State misstated the law regarding mercy."

      C.    "The State improperly encouraged jurors to sentence Mr. Lisle based on passion and prejudice."

      D.    "The State improperly disparaged trial counsel and Mr. Lisle."

      E.    "The State argued the death penalty was necessary to prevent Mr. Lisle from killing again."

      F.    "The State made a misrepresentation to the trial court."

G.    The State's misconduct should be considered singly and cumulatively.

H.    "Trial, appellate, and post-conviction counsel were ineffective for failing to challenge the extensive prosecutorial misconduct which occurred in Mr. Lisle's trial."

9.    Lisle's federal constitutional rights were violated "because Mr. Lisle was forced to wear a stun belt and shackles during the guilt and penalty phases of his trial."

A.    "The trial court erred in failing to conduct a hearing to determine whether an essential state interest necessitated the use of a stun belt and shackles."

B.    "Trial counsel were ineffective for failing to object to the restraints."

C.    "Appellate and post-conviction counsel were ineffective in failing to raise this claim."

10.   Lisle's federal constitutional rights were violated "because the trial court erroneously denied Mr. Lisle's motion to sever the charge of being an ex-felon in possession of a firearm from his first-degree murder charge."

11.   Lisle's federal constitutional rights were violated "because the trial court erroneously admitted the out-of-court testimony of a witness who inculpated Mr. Lisle."

12.   Lisle's federal constitutional rights were violated "because the State's failure to disclose material exculpatory and impeachment evidence deprived Mr. Lisle of fundamentally fair proceedings."

A.    "The State failed to disclose material impeachment evidence related to its witness Adam Evans."

B.    "The State failed to disclose material impeachment evidence related to its witness John Melcher."

C.    "The State failed to turn over handwritten notes of a conversation with Mr. Melcher."

D.    "The CCDA's 'open file' policy failed to comply with constitutional discovery obligations."

E.    "The State failed to disclose cash payments made to witnesses."

9

13.   Lisle's federal constitutional rights were violated "because the trial court erroneously denied Mr. Lisle's motion to call John Melcher's attorney to testify."

14.   Lisle's federal constitutional rights were violated "because the trial court did not strike the testimony of John Melcher because the State had instructed Mr. Melcher not to speak to Mr. Lisle's attorneys."

15.   Lisle's federal constitutional rights were violated "because the trial court erroneously instructed the jury at the guilt and penalty phase proceedings."

    A.   The trial court improperly instructed the jury in the guilt phase of the trial.

        1.   The trial court improperly instructed the jury regarding the elements of first-degree murder.

        2.   The trial court improperly instructed the jury regarding reasonable doubt.

        3.   The trial court failed "to give a curative instruction after the erroneous introduction of prior bad act evidence."

        4.   The trial court "failed to properly instruct the jury on the theories of aiding and abetting and conspiracy to commit murder."

        5.   The trial court did not properly instruct the jury regarding possession of a deadly weapon.

        6.   The trial court gave an "equal and exact justice instruction," which "improperly minimized the State's burden of proof."

    B.   The trial court improperly instructed the jury in the penalty phase of the trial.

        1.   The trial court gave an "anti-sympathy" instruction.

        2.   The trial court failed to instruct the jury "regarding the limited use of prior bad act evidence."

16.   Lisle's federal constitutional rights were violated "because the trial court erroneously denied Mr. Lisle's motion to sever his trial from that of his co-defendant."

10

A.     "The denial of severance violated Mr. Lisle's right to confrontation."

B.     "Evidence of the Logan homicide was admitted."

C.     "False testimony was admitted."

D.     "Mitigating evidence was precluded."

E.     "Admission of evidence of Mr. Lopez's alibi prejudiced Mr. Lisle."

F.     "Denial of an individualized sentencing determination."

G.     "Considered singly or in combination with the other constitutional errors identified in this petition, the failure to sever Mr. Lisle's trial from that his codefendant had a substantial and injurious effect on Mr. Lisle's conviction and death sentence," and Lisle's trial, appellate and state post-conviction counsel were ineffective in their handling of the issue.

17.     Lisle's federal constitutional rights were violated "because the trial court erroneously denied Mr. Lisle's motion to compel discovery of the State's written notes of an interview with its key witness John Melcher."

18.     Lisle's federal constitutional rights were violated "because the trial court erroneously struck Darlene Falvey's testimony, depriving Mr. Lisle of an opportunity to rebut evidence of aggravating circumstances."

19.     Lisle's federal constitutional rights were violated "because the State improperly referred to the fact that another jury had sentenced Mr. Lisle to death."

20.     Claim 20 reiterates claims made elsewhere in the petition.

21.     Lisle's federal constitutional rights were violated "by the failure to submit all of the elements of capital eligibility to the grand jury or to a court for a probable cause determination."

22.     Lethal injection is cruel and unusual punishment.

A.     "Lethal injection is unconstitutional in all circumstances."

B.     "Lethal injection in Nevada is unconstitutional."

23.     Lisle's federal constitutional rights were violated "because Mr. Lisle's capital trial, sentencing, and review on direct appeal were conducted before state judicial officers whose tenure in office was not during

11

good behavior but whose tenure was dependent on popular election."

24. Lisle's federal constitutional rights were violated "because the state courts failed to provide Mr. Lisle with the effective assistance of counsel during the appellate and post-conviction stages of his proceedings."

25. Lisle's death sentence is invalid under the federal constitution "because the Nevada capital punishment system operates in an arbitrary and capricious manner."

26. Lisle's death sentence is invalid under the federal constitution "because the death penalty is cruel and unusual punishment in all circumstances."

27. "Mr. Lisle's sentence violates the International Covenant on Civil and Political Rights."

28. Lisle's federal constitutional rights were violated "due to the cumulative errors in the admission of evidence and instructions, gross misconduct by state officials and witnesses, and the systematic deprivation of Mr. Lisle's right to the effective assistance of counsel."

29. Lisle's conviction and death sentence are invalid under the federal constitution "because he may become incompetent to be executed."

30. Lisle's "trial, conviction, sentence, appeal and all post-conviction proceedings are and were fundamentally unfair," and in violation of the federal constitution, "because severe mental and physical illness rendered him incompetent during those proceedings," and because of "maltreatment while incarcerated."

   A.   "Mr. Lisle had known mental and physical issues … before his trial."

   B.   "Circumstances of Mr. Lisle's confinement at Ely State Prison have exacerbated Mr. Lisle's physical and mental health issues."

31. Lisle's federal constitutional rights were violated "because Mr. Lisle's attorneys failed to object to the admission of evidence during the penalty phase of his trial which recounted events that did not result in a criminal conviction and that occurred before Mr. Lisle reached the age of eighteen."

32. Lisle's federal constitutional rights were violated "because the State committed prosecutorial misconduct in presenting testimony that improperly bolstered its witnesses; the trial court erred in allowing that testimony; and trial counsel provided ineffective assistance in

12

failing to object to that testimony, move to strike that testimony, and move for a mistrial following the jury's exposure to that testimony."

33.  Lisle's federal constitutional rights were violated "because the trial court erroneously admitted hearsay evidence of an alleged prior bad act committed by Mr. Lisle."

34.  Lisle's federal constitutional rights were violated "because the trial court erred in allowing the State to present evidence of Mr. Lisle's gang membership; trial counsel were ineffective when they failed to object to evidence of Mr. Lisle's gang membership and even elicited some evidence about that issue themselves; and the State committed misconduct when it elicited evidence about Mr. Lisle's gang membership in violation of the trial court's pretrial order."

35.  Lisle's federal constitutional rights were violated "because trial counsel rendered constitutionally deficient assistance when they failed to cover their client's tattoos for trial and failed to object to the State's gratuitous and inflammatory references to the tattoos; and because the trial court erred in admitting State's Exhibit 31."

36.  Lisle's federal constitutional rights were violated because "the trial court erroneously admitted the testimony of Edward Ortiz, and trial counsel rendered deficient performance when they failed to request a limiting instruction on the jury's use of that testimony, and the trial court erroneously admitted the testimony of Jeff Kurtz."

On June 20, 2017, Respondents filed a motion to dismiss Lisle's fourth amended petition. (ECF No. 293.) In ruling on that motion, the Court took into consideration the supplemental memoranda filed by Lisle's separate counsel in response to the motion to dismiss the third amended petition. (ECF Nos. 240, 262.) On July 2, 2018, the Court granted the motion to dismiss in part and denied it in part. (ECF No. 317.) The Court dismissed all claims in Lisle's fourth amended petition except the following:

-  the claim in Claim 1 asserting ineffective assistance of trial counsel in the guilt phase of the trial, for failing to object to the prosecutor's expressions of personal opinion and aligning of himself with the jury, in closing arguments;

-  the claim in Claim 1 asserting ineffective assistance of trial counsel in the penalty phase of the trial, for failing to object to the prosecutor's expressions of personal opinion and aligning of himself with the jury, in closing arguments;

-  the claim in Claim 1 asserting ineffective assistance of trial counsel in the penalty phase of the trial, for failing to object to the prosecutor's

argument that allegedly improperly shifted to the defense the burden to prove that mitigating circumstances did not outweigh aggravating circumstances;

- the claim in Claim 1 asserting ineffective assistance of trial counsel in the penalty phase of the trial, for failing to object to the prosecutor's argument that the jury should "send a message;"

- the claim in Claim 1 asserting ineffective assistance of trial counsel in the penalty phase of the trial, for failing to object to the prosecutor's argument that Lisle would present a danger in the future;

- Claim 2;

- Claim 8A;

- Claim 8B1;

- Claim 8C;

- Claim 8E;

- Claim 8G (regarding Claims 8A, 8B1, 8C and 8E);

- the claims of ineffective assistance of trial counsel in Claim 8H (regarding Claims 8A, 8B1, 8C and 8E);

- Claim 10, except for the claims of ineffective assistance of appellate and post-conviction counsel;

- Claim 16, except for the claims of ineffective assistance of appellate and post-conviction counsel;

- Claim 22B;

- Claim 28; and

- Claim 29.

(ECF No. 317.)

On October 1, 2018, Respondents filed an answer, responding to Lisle's remaining claims. (ECF No. 318.) Lisle filed a reply on March 1, 2019. (ECF No. 329.) Respondents filed a response to Lisle's reply on April 1, 2019. (ECF No. 343.)

On March 7, 2019, Lisle filed a motion for evidentiary hearing, requesting an evidentiary hearing regarding certain of his remaining claims. (ECF No. 337.)

14

Respondents filed an opposition to that motion on April 1, 2019. (ECF No. 344.) Lisle filed a reply in support of the motion on April 22, 2019. (ECF No. 350.)

In the meantime, on February 19, 2019, Lisle filed a *pro se* motion to waive further proceedings and voluntarily dismiss this action. (ECF No. 359.) Proceedings regarding that matter ensued, including an evidentiary hearing on November 12 and 13, 2020, regarding the question whether Lisle's waiver was knowing, intelligent, and voluntary. (ECF Nos. 447, 448.) At the conclusion of the evidentiary hearing, Lisle withdrew his motion.

Then, on April 2, 2021, Lisle's counsel filed a notice (ECF No. 454) stating that they received a declaration from Lisle (ECF No. 455-1) alleging retaliation on account of the proceedings regarding his motion to waive further proceedings. At a hearing on October 13, 2021, concerning that matter, the Court ordered that a separate civil rights action under 42 U.S.C. § 1983 would be opened for adjudication of Lisle's claims of retaliation. (ECF No. 471.) Proceedings regarding that matter are ongoing in Case No. 3:21-cv-00445-MMD-CLB in this Court.

In the course of the proceedings on Lisle's motion to waive further proceedings, the Court denied Lisle's motion for evidentiary hearing (ECF No. 337) without prejudice and subject to renewal. (ECF No. 358.) The Court considers that motion to be renewed, and addresses that motion in this order, in conjunction with the merits of Lisle's remaining claims.

On May 6, 2022, the Court ordered Lisle to show cause as to why certain of his remaining claims—Claims 8A, 8C (in part), 16B, 16C, 16E and 16F—should not be denied as procedurally defaulted. (ECF No. 474.) Lisle filed a response to that order on July 6, 2022 (ECF No. 477), and Respondents filed a response on August 5, 2022 (ECF No. 478).

///

15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.    DISCUSSION

#### A.    Standard of Review

Because this action was initiated after April 24, 1996, the amendments to 28 U.S.C. § 2254 enacted as part of the Antiterrorism and Effective Death Penalty Act (AEDPA) apply. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir. 2000), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003). 28 U.S.C. § 2254(d) sets forth the primary standard of review under the AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires

the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id*. (*quoting Williams*, 529 U.S. at 409). The analysis under section 2254(d) looks to the law that was clearly established by United States Supreme Court precedent at the time of the state court's decision. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has also instructed that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (AEDPA standard is "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

**B.  Alleged Prosecutorial Misconduct and Related Claims of Ineffective Assistance of Counsel**

**1.  Expressing Personal Opinion and Aligning with Jury (Claims 1 (in Part), 8A, 8H (in Part))**

In Claim 8, Lisle claims that his federal constitutional rights were violated because of prosecutorial misconduct. (ECF No. 292 at 293-94.) In subpart A of Claim 8, Lisle claims that, in closing argument in both the guilt and penalty phases of his trial, the prosecutors improperly expressed personal opinions and aligned themselves with the jury. (*Id*. at 294-95.) In parts of Claims 1 and 8H, Lisle claims that his trial counsel were ineffective because they failed to object to this misconduct and failed to request the court to instruct the jury to disregard the improper argument. (*Id*. at 76-77, 304.)

17

In Claim 8A, Lisle identifies four kinds of arguments made by the prosecutors in which he claims they expressed personal opinions or aligned themselves with the jury. First, Lisle points out that one of the prosecutors repeatedly used first-person plural pronouns such as "we" and "us." (*Id*. at 295.) Second, Lisle points out that one of the prosecutors used phrases such as "I think," "I believe," and "I know." (*Id*. at 294-95.) Third, Lisle points out that one of the prosecutors stated, "I want you to understand that the death penalty, according to the evidence, is available to both of them." (*Id*. at 294.) And fourth, Lisle points out that one of the prosecutors said "[t]hat's ridiculous," in response to a defense argument that a witness was lying. (*Id*.)

Of the claims in Claim 8A and the related parts of Claims 1 and 8H, only one presents no issue with respect to possible procedural default, that being the claim that Lisle's trial counsel was ineffective for not objecting to the prosecutor's use of pronouns such as "we" and "us." Lisle asserted that claim on the appeal in his first state habeas action (ECF No. 188-2 at 37-42), and the Nevada Supreme Court ruled on the claim as follows:

> Lisle claims that trial counsel was ineffective for failing to object to the prosecutor's allegedly improper statements. [Footnote: We will not revisit Lisle's independent claims that the district court abused its discretion by not sua sponte tempering the prosecutor's statements. We rejected these claims on direct appeal. *Lisle*, 113 Nev. at 705-07, 941 P.2d at 476-77. The law of the case doctrine precludes reconsideration. *Hall v. State*, 91 Nev. 314, 535 P.2d 797 (1975).]

> When addressing the jury in his closing arguments, the prosecutor repeatedly used the words "we" and "us." Lisle claims that by addressing the jury this way, the prosecutor suggested he was aligned with the jury and interjected his personal opinion.

> Due to the risk that the jury will unduly rely on the prosecutor's conclusions because of his or her greater experience and knowledge, a prosecutor may not assert his personal opinions during his arguments. [Footnote: *Collier v. State*, 101 Nev. 473, 480, 705 P.2d 1126, 1130 (1985).] For the same reasons, a prosecutor should not speak in a manner that suggests that he or she has the same duties as or is aligned with the jury in determining a defendant's guilt or punishment. [Footnote: *Snow v. State*, 101 Nev. 439, 447-48, 705 P.2d 632, 639 (1985).] While this court has condemned prosecutors' use of the words "we" and "us" in this way, the use

18

of those words is not always improper. [Footnote: *See Schoels v. State*, 114 Nev. 981, 987-88, 966 P.2d 735, 739 (1988), *modified on rehearing* 115 Nev. 33, 975 P.2d 1275 (1999).] In this case, we conclude that the prosecutor's use of the words "we" and "us" did not suggest that he was aligned with the jury. Rather, the prosecutor frequently emphasized the jury's duty to decide Lisle's guilt and punishment. Because the prosecutor's rhetoric was not improper, trial counsel was not ineffective for declining to object.

(ECF No. 188-5 at 3-4.)

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two-prong test for claims of ineffective assistance of counsel. The petitioner must demonstrate (1) that the attorney's representation "fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. A court considering a claim of ineffective assistance of counsel must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id*. at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. And, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. Where a state court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104-05. In *Harrington*, the Supreme Court instructed:

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, [*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The

19

> *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 994-95 (2010) (double deference required with respect to state court adjudications of *Strickland* claims).

Examples of the arguments of the prosecutors, using pronouns such as "we" and "us," cited by Lisle, are the following:

- "In other words, a killing can occur if there's a good reason for it, and in this particular case we've got to ask ourselves some of the questions that this first sentence asks." (ECF No. 198-2 at 20.)

- "There was an unlawful motive or purpose to injure another and we know now that Justin Lusch is no longer with us because of that." (*Id.* at 21.)

- "Well, that pretty much matches up to what Jeff Kurtz told us and what Adam Evans told us." (*Id.* at 41.)

- "Why would they want to buy a car cover for a car window that had been broken for some period of time, in August where we don't have a lot of rain[?]" (*Id.* at 45.)

- "We're here to decide the penalty of two individuals that stand before you convicted of murder in the first degree." (ECF No. 199-3 at 19.)

- "In our system for a decade, been in prison with adults." (*Id.* at 30.)

- "But for the participation of Jerry Lopez, we're not here today." (*Id.* at 32.)

(*See also* ECF Nos. 198-2 at 20-44, 199-3 at 19-42.)

Lisle cites no authority holding that a prosecutor's use of first-person plural pronouns necessarily unfairly aligns the prosecution with the jury. On the other hand, there is authority to the contrary. *See United States v. Martinez*, 484 F. App'x 177, 178-79 (9th Cir. 2012) ("The prosecutor's 'we know' statements did not depict the prosecutor

20

1    as part of the investigatory team but rather were a rhetorical device used to summarize

2    the evidence and describe permissible inferences"); *United States v. Younger*, 398 F.3d

3    1179, 1190-91 (9th Cir. 2005) (the prosecutor's repeated use of the phrase "we know" in

4    closing argument was not improper and did not materially affect the fairness of the trial).

5        Here, the prosecutors' use of such pronouns appears primarily to have been a

6    rhetorical device used to summarize the evidence and describe permissible inferences

7    and conclusions. (ECF Nos. 198-2 at 20, 23, 25, 30, 39, 41, 199-3 at 21, 30, 31, 41.) In

8    some cases, the prosecutors' use of such pronouns referred to everyone who heard

9    particular testimony or instructions from the judge. (ECF Nos. 198-2 at 27, 39-41, 199-3

10   at 24.) In other cases, the use of "we" or "us" referred only to the prosecution. (ECF Nos.

11   198-2 at 25, 27, 199-3 at 30, 33.) In other cases, the use of such pronouns simply referred

12   to people who live in Las Vegas. (ECF Nos. 198-2 at 45, 199-3 at 34-35.)

13       After careful examination of the usage by the prosecutors of first-person pronouns

14   such as "we" and "us" in their arguments, and applying the deference required under the

15   AEDPA and *Strickland*, the Court concludes that fair-minded jurists could argue that the

16   Nevada Supreme Court was correct in ruling that Lisle's trial counsel did not perform

17   unreasonably in declining to object or in declining to request a curative instruction, and

18   that there is no reasonable probability that, had counsel objected or requested a curative

19   instruction, the result of the trial would have been different. The Court will, therefore, deny

20   Lisle habeas corpus relief on this part of Lisle's claims of ineffective assistance of trial

21   counsel in Claims 1 and 8H.

22       Turning now to the substantive claim regarding the prosecutors' use of pronouns

23   such as "we" and "us" in their arguments, the parties disagree as to whether that claim is

24   procedurally defaulted.

25       In *Coleman v. Thompson*, the Supreme Court held that a state prisoner who fails

26   to comply with the State's procedural requirements in presenting his claims is barred by

27

28
                                        21

the adequate and independent state ground doctrine from obtaining a writ of habeas corpus in federal court. 501 U.S. 722, 731-32 (1991) ("Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance"). Where such a procedural default constitutes an adequate and independent state ground for denial of habeas corpus, the default may be excused only if "a constitutional violation has probably resulted in the conviction of one who is actually innocent," or if the prisoner demonstrates cause for the default and prejudice resulting from it. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

To demonstrate cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule. *Id*. at 488. For cause to exist, the external impediment must have prevented the petitioner from raising the claim. *See McCleskey v. Zant*, 499 U.S. 467, 497 (1991). With respect to the prejudice prong, the petitioner bears "the burden of showing not merely that the errors [complained of] constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989) (citing *United States v. Frady*, 456 U.S. 152, 170 (1982)).

In the May 6, 2022, order to show cause, the Court ordered Lisle to show cause as to why Claim 8A should not be denied as procedurally defaulted. (ECF No. 474.) In response, Lisle argues that Respondents waived the procedural default defense with respect to Claim 8A. The Court determines, however, that there was no waiver. (ECF No. 293 at 23.) And, at any rate, regardless of whether or not Respondents' motion to dismiss is read to assert the procedural default defense to all or part of Claim 8A, the Court has discretion to raise the issue *sua sponte* if the circumstances warrant and the Court gives

the petitioner notice and an opportunity to respond, as the Court has done here. *See Boyd v. Thompson*, 147 F.3d 1124, 1128 (9th Cir. 1998).

Nevertheless, with respect to the argument that the prosecution committed misconduct by using pronouns such as "we" and "us," Lisle did raise that claim on his direct appeal, and it is not procedurally defaulted. As the Court reads the Nevada Supreme Court's rulings on the claim on Lisle's direct appeal and on the appeal in his first state habeas action, the Court concludes that the Nevada Supreme Court ruled on the claim on its merits, albeit without discussion. (ECF No. 188-5 at 3 n.7 (appeal in first habeas action)). *See Lisle*, 941 P.2d at 474, 476 (direct appeal). On the appeal in Lisle's first state habeas action, the Nevada Supreme Court stated that it would not revisit the claim because it was barred by the law of the case doctrine, meaning that the Nevada Supreme Court saw the claim as having been resolved on its merits on the direct appeal. Therefore, the Court addresses this claim on its merits, affording the state court's denial of relief on the claim the deference required under 28 U.S.C. § 2254(d)(1).

Where the state court summarily denies a claim without discussion of the claim, a presumption exists that the state court adjudicated the claim on the merits, unless "there is reason to think some other explanation for the state court's decision is more likely." *Harrington*, 562 U.S. at 99-100. In such a case, applying § 2254(d)(1), the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id*. at 102.

The Supreme Court precedent that applies here is *Darden v. Wainwright*, 477 U.S. 168 (1986). In *Darden*, the Supreme Court held that prosecutorial misconduct rises to the level of a constitutional violation where it "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." 477 U.S. at 181. This is obviously a very

general standard. Regarding application of such a general standard under § 2254(d)(1), the Supreme Court has stated:

> Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. Cf. *Wright v. West*, 505 U.S. 277, 308–309, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (KENNEDY, J., concurring in judgment).

*Yarborough v. Alvarado*, 541 U.S. 652, 663-64 (2004).

As is discussed above in the context of the related claim of ineffective assistance of trial counsel, the prosecution's use of first-person plural pronouns such as "we" and "us" was not such as to align the prosecution with the jurors to such a degree as to infect Lisle's trial with unfairness and violate his federal constitutional right to due process of law. *See Darden*, 477 U.S. at 181. The Court will deny Lisle habeas corpus relief on this part of Claim 8A.

Turning to the other prosecutorial misconduct alleged in Claim 8A, and the related claims of ineffective assistance of trial counsel, none of those claims were raised on Lisle's direct appeal or on the appeal in his first state habeas action, and all of them are subject to dismissal as procedurally defaulted unless Lisle can overcome the procedural default. Lisle does not make any colorable argument that he can overcome the procedural default of these substantive claims, and those will therefore be denied as procedurally defaulted.

As for the related claims of ineffective assistance of trial counsel, Lisle asserts that he can overcome the procedural defaults under *Martinez v. Ryan*, 566 U.S. 1 (2012). In *Martinez*, the Supreme Court ruled that ineffective assistance of post-conviction counsel may serve as cause to overcome the procedural default of a claim of ineffective assistance of trial counsel. To establish cause and prejudice regarding the procedural

default of a claim of ineffective assistance of trial counsel, under *Martinez*, a petitioner

must show that:

> (1) post-conviction counsel performed deficiently; (2) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different, and (3) the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.

*Ramirez v. Ryan*, 937 F.3d 1230, 1242 (9th Cir. 2019) (internal quotation marks omitted).

Lisle claims that his trial counsel was ineffective for not objecting, or not requesting a

curative instruction, when the prosecutors stated personal opinions in their closing

arguments by using phrases such as "I think," "I believe," and "I know." (ECF No. 292 at

76-77, 294-95, 304.) Examples of these comments by the prosecutors, cited by Lisle, are

the following:

> -   "Well to shoot anybody—there aren't any among us, I think, who would not agree that is a wrongful act. Was that shooting intentional as this instruction requires? I don't think after hearing the evidence that you would consider this to have been an accident, some sort of mischance." (ECF No. 198-2 at 20.)
>
> -   "She was a gang counselor in school, talked to hundreds of them, I think she said." (*Id*. at 42.)
>
> -   "I believe Mr. Seaton alluded to it, but you've got a car with a broken window for, quote, unquote, some time; yet it's all of a sudden in Las Vegas where it never rains that these people are going to go out and buy a car cover the day after this murder is committed." (*Id*. at 37.)
>
> -   "I think we could see that in the mom when she took the stand." (ECF No. 199-3 at 28.)

(*See also* ECF Nos. 198-2 at 30, 35, 38, 43, 199-3 at 33, 37.)

As a general rule, a prosecutor may not express a personal opinion regarding the

guilt of a defendant or regarding the credibility of a witness. *See United States v. McKoy*,

771 F.2d 1207, 1210-11 (9th Cir. 1985). In this case, the prosecutors used the phrases "I

think," "I believe," and "I know," in most instances, in reference to their recollection of the

testimony, or their recollection of what the other prosecutor had said. (ECF Nos. 198-2 at 30, 35, 38, 42, 43, 199-3 at 33, 37.) At other times, the prosecutors used such phrases to suggest inferences or conclusions that could be drawn from the evidence. (ECF Nos. 198-2 at 20, 199-3 at 28.) It does not appear that the prosecutors ever used such language to suggest that they had information beyond the testimony or other evidence admitted at trial. And the prosecutors never used such language to express their opinion on the ultimate question of Lisle's guilt. Moreover, the prosecutors repeatedly used the pronoun "you" when indicating that it was ultimately up to the jurors to decide what inferences and conclusions should be drawn. (ECF No. 198-2 at 26, 27, 29, 30, 32, 33, 46.) While it was arguably improper for the prosecutors to frame arguments in terms of their own beliefs or thoughts, the phrasing of the prosecution's arguments was nowhere near such as to affect the outcome of Lisle's trial. This Court determines that the claim of ineffective assistance of counsel for trial counsel's failure to object to these arguments, or for counsel's failure to request a curative instruction, is insubstantial. The Court determines that Lisle does not overcome the procedural default of this ineffective assistance of counsel claim under *Martinez.* The claim will be denied on the ground of procedural default.

Lisle also claims that his trial counsel was ineffective for not taking action when, during closing argument in the penalty phase of the trial, the prosecutor stated:

> So we're about to talk about what penalties are appropriate for each of these two individuals. But as we do, I want you to understand that the death penalty, according to the evidence, is available to both of them. If you choose, you can give either one of these defendants or both of them the death penalty. Whether you choose to or not obviously is going to be your own choice.

(ECF Nos. 199-3 at 33, 292 at 76-77, 294, 304.) This argument was not improper. The prosecutor stated what penalties were "available," "according to the evidence." The prosecutor did not say which penalty should, in his opinion, be imposed; the prosecutor stated that the decision was the jury's. This claim of ineffective assistance of trial counsel

1
2
3
is insubstantial. Lisle does not overcome the procedural default of this ineffective assistance of counsel claim under *Martinez*. This claim, too, will be denied on the ground of procedural default.

4
5
6
7
8
9
10
Lisle also claims that his trial counsel was ineffective for not taking action when one of the prosecutors argued, with regard to a defense argument that a witness was lying, "[t]hat's ridiculous." (ECF Nos. 198-3 at 26, 292 at 76-77, 294, 304.) That, however, was an acceptable argument that the inference that the witness was lying should not be drawn. This claim of ineffective assistance of trial counsel is also insubstantial. Lisle does not overcome the procedural default of this claim under *Martinez*, and it, too, will be denied on the ground of procedural default.

11
12
Therefore, the Court will deny Lisle habeas corpus relief on all of Claim 8A and the related claims of ineffective assistance of trial counsel in Claims 1 and 8H.

13
14
15
16
17
18
19
20
21
22
In his motion for an evidentiary hearing, Lisle requests an evidentiary hearing on the claims of ineffective assistance of counsel. (ECF No. 337 at 5-6.) Lisle's motion for evidentiary hearing, though, is presented in a conclusory fashion, without any indication as to what specific factual question would be addressed and what testimony or other evidence would be presented. The prosecutorial misconduct alleged in Claim 8A is in the record, and the Court resolves these claims based on the record without need for an evidentiary hearing. Moreover, Lisle does not make any showing that an evidentiary hearing would be justified under 28 U.S.C. § 2254(e). *See* 28 U.S.C. § 2254(e)(2); *Shinn v. Ramirez*, 142 S. Ct. 1718, 1734, 1739-40 (2022). The Court concludes that an evidentiary hearing is unwarranted on these claims.

23
24
> **2.    Shifting Burden of Proof Regarding Weighing of Aggravating and Mitigating Circumstances (Claims 1 (in Part), 8B1, 8H (in Part))**

25
26
In subpart B1 of Claim 8, Lisle claims that, in closing argument in the penalty phase of his trial, the prosecution committed misconduct by making arguments that had the

27
28

effect of improperly shifting to him the burden of proof regarding the weighing of aggravating and mitigating circumstances. (ECF No. 292 at 296.) In parts of Claims 1 and 8H, Lisle claims that his trial counsel were ineffective for failing to object to this argument and failing to request the court to instruct the jury to disregard it. (*Id*. at 76-77, 304.) Claim 8B1, in its entirety, is as follows:

> The State improperly shifted its burden to prove that mitigating circumstances did not outweigh aggravating circumstances. In penalty phase closing argument, the State argued that Mr. Lisle had failed to call experts to substantiate his evidence of mitigating circumstances:

>> I don't remember the psychiatrist who came in and said that there was some sort of an interrelationship between whatever acts happened back in Kevin Lisle's childhood . . .

> ECF No. 199-3 at 27. Trial counsel objected, but the trial court denied the objection, stating, "I think that it's the subject of fair comment by Mr. Seaton." *Id*. at 28. Mr. Seaton continued:

>> If you are to be asked to believe that there is some sort of psychological problem, something that arose out of the childhood abuse, be it physical or mental, certainly there could be a mental health expert who could explain that to you and none has come in . . .

> *Id*. Consequently, the jury did not consider Mr. Lisle's abusive childhood as a mitigating circumstance. *See* ECF No. 73-3 at 28-29.

(*Id*. at 296.)

> The portion of the prosecution penalty-phase closing argument that is the subject of this claim, in its full context, is the following:

> [MR. SEATON (prosecutor):] The defendant's physically and sexually abusive childhood and adolescence. Now, we've heard a little bit about it, thumbtacks and the diaper and getting beat up by the older brother and things that probably—I don't know that thumbtacks go on in every family and I don't know that they went on in this family. It came only from Mrs. Lisle, who told us about it. But we didn't hear anything of great serious consequence. I don't remember the psychiatrist who came in and said that there was some sort of an interrelationship between whatever acts happened back in Kevin Lisle's childhood—

> MS. BLASKEY [Lisle's counsel]: Judge, I object. We have absolutely no burden to bring in a psychiatrist or a professional witness to say that. Absolutely not.

28

1    MR. SEATON:  I'm not suggesting they do. I'm suggesting what the evidence isn't.

2
     THE COURT:  The objection is noted for the record. I think that it's
3    the subject of fair comment by Mr. Seaton.

4    MR. SEATON:  If you are to be asked to believe that there is some
     sort of psychological problem, something that arose out of childhood abuse,
5    be it physical or mental, certainly there could be a mental health expert who
     could explain that to you and none has come in short of the mother. This
6    was probably a dysfunctional family. I think we could see that in the mom
     when she took the stand. But certainly you have not been given anything
7    on behalf of the Defendant Lisle which would show you that his physically
     and sexually abusive childhood and adolescence contributed to what
8    happened here, even that it ever existed to the extent that Mrs. Lisle would
     want you to believe that it existed.

9    (ECF No. 199-3 at 27-28.)

10       Lisle asserted this claim on his direct appeal (ECF No. 186-23 at 90, 92-93), and

11   the Nevada Supreme Court ruled as follows:

12       One of the mitigating circumstances that Lisle put forth was his
     physically and sexually abusive childhood and adolescence. During closing
13   arguments, the prosecutor commented that the only evidence of this abuse
     was from Lisle's mother. He further stated, "I don't remember the
14   psychiatrist who came in and said that there was some sort of an
     interrelationship between whatever acts happened back in Kevin Lisle's
15   childhood." The court overruled defendant's objection, stating it was the
     subject of fair comment. The jury did not find Lisle's abusive childhood as a
16   mitigating factor. Lisle contends on appeal that the prosecutor's comment
     improperly shifted the burden of proof.
17
         This court held that it is generally improper for a prosecutor to
18   comment on the defendant's failure to call witnesses because that shifts the
     burden of proof to the defense. *Whitney v. State*, 112 Nev. 499, 502, 915
19   P.2d 881, 882 (1996). In *Whitney*, the prosecutor made numerous remarks
     about the defense failing to produce particular fact witnesses. Here, the
20   prosecutor made only a few general remarks about the lack of expert
     witnesses, not a specific person.
21
         In *People v. Kelly*, 51 Cal.3d 931, 275 Cal.Rptr. 160, 182, 800 P.2d
22   516, 538 (1990), *cert. denied*, 502 U.S. 842, 112 S.Ct. 134, 116 L.Ed.2d
     101 (1991), during the penalty hearing, the prosecutor commented that the
23   defendant did not present evidence of his longstanding psychological and
     social pathologies or that such pathologies caused his violent nature. The
24   court held that the prosecutor merely pointed out that the defendant failed
     to substantiate his claim that the crime he committed was a result of his
25   psychological problems. *Id*.

26       We conclude that, likewise, the prosecutor in the instant matter was
27   merely pointing out that Lisle did not substantiate his claim of abuse as a

28                                              29

1

mitigator and was contrasting the weight of evidence. Accordingly, the district court did not err in allowing the comments.

2

*Lisle*, 941 P.2d at 477.

3

Under Nevada law, in the penalty phase of a capital case, the defendant has the

4

burden of presenting mitigating evidence. *See Sonner v. State*, 930 P.2d 707, 717 (Nev.

5

1996). In *Sonner*, in closing arguments in the penalty phase of the trial, the prosecutor

6

commented on the defendant's failure to call his mother as a witness; the Nevada

7

Supreme Court rejected the argument that the prosecutor's comment improperly shifted

8

the burden of proof:

9

10

11

12

> The harmless comment did not occur during the guilt phase, where the State has the exclusive burden of proving the defendant guilty beyond a reasonable doubt. *During the penalty phase, the defendant has the burden of presenting mitigating evidence*, if any exists. *See Bishop v. State*, 95 Nev. 511, 517, 597 P.2d 273, 276 (1979). Therefore, the prosecutor's brief expression of interest in the mother's failure to testify could not have improperly shifted the burden to the defense. This issue is without merit.

13

*Id.* (emphasis added). Moreover, under Nevada law, the determination whether mitigating

14

circumstances outweigh aggravating circumstances is not considered a factual

15

determination subject to proof but is rather a moral determination to be made by the jury;

16

there is no burden of proof imposed on the prosecution with respect to the weighing of

17

aggravating and mitigating circumstances. *See McConnell v State*, 212 P.3d 307, 314-15

18

(Nev. 2009); *Nunnery v. State*, 263 P.3d 235, 250-53 (Nev. 2011).

19

Lisle's assertion in Claim 8B1 that "[t]he State improperly shifted its burden to

20

prove that mitigating circumstances did not outweigh aggravating circumstances" (ECF

21

No. 292 at 296) is premised on a misstatement of Nevada law. The State had no "burden

22

to prove that mitigating circumstances did not outweigh aggravating circumstances," so

23

there was no such burden to be shifted to Lisle.

24

Taking a somewhat different approach in his reply, Lisle argues that the

25

prosecutor's argument "restricted the jury's duty to consider all mitigating evidence by

26

arguing that there needed to be a causal nexus between mitigation evidence and the

27

28

30

offense." (ECF No. 329 at 50.) In addition, Lisle argues that the prosecutor "told the jury that they should not consider evidence of Lisle's childhood abuse because Lisle had not presented an expert to testify as to the effect of that abuse." (*Id*. at 49 (citing ECF No. 199-3 at 27-28).) But the prosecutor said no such thing. (ECF No. 199-3 at 27-28.) The prosecutor pointed out that there was no causal nexus shown, and he pointed out that there was no expert witness testimony presented regarding the abuse Lisle suffered, but he did not say that there had to be either in order for the jury to consider the evidence of Lisle's childhood abuse as a mitigating circumstance. As the Nevada Supreme Court found, the prosecutor's comments went only to the nature and strength of Lisle's mitigating evidence—"we didn't hear anything of great serious consequence," the prosecutor said. (*Id*. at 27.)

Lisle bases this part of Claim 8B1 primarily on *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007). In *Abdul-Kabir*, a capital case in Texas, the trial court instructed the jury to make findings on two "special issues": whether the defendant's conduct was committed deliberately and with the reasonable expectation it would result in the death of the victim or another, and whether it was probable the defendant would commit future acts of violence constituting a continuing threat to society. *See* 550 U.S. at 238. Under Texas law, affirmative findings on both of those special issues would result in imposition of the death penalty. *See id*. at 239. The defendant presented mitigating evidence in the form of lay witness testimony about his unhappy childhood and expert witness testimony about the effects of childhood neglect and abandonment and neurological damage. *See id*. at 239-41. The prosecutor, however, discouraged the jurors from taking the defendant's mitigating evidence into account, asking them to make findings only on the special issues and to disregard any other considerations. *See id*. at 241-42, 244 n.5. The jury found in the affirmative on both special issues, and the defendant was sentenced to death.

The Texas courts denied the defendant relief on his claim that the jury was prevented from giving meaningful consideration to constitutionally relevant mitigating evidence, as did the federal district court and federal court of appeals in the defendant's federal habeas action. *See id*. at 242-46. The Supreme Court reversed and remanded, reaffirming a rule established earlier in *Penry v. Lynaugh*, 492 U.S. 302 (1989), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002), that special jury instructions are necessary when the jury might not otherwise give meaningful effect to a defendant's mitigating evidence, or, in the context of the Texas scheme, when the defendant's evidence may have meaningful relevance to the defendant's moral culpability beyond the scope of the special issues. *See id*. at 252-58.

In Lisle's case, there was no Nevada law or jury instruction potentially limiting the jury's consideration of Lisle's evidence of abuse in his background as a mitigating circumstance. (ECF No. 186-6 (jury instructions).) Defining "mitigating circumstances," the jury instructions in this case stated: "Mitigating circumstances are those factors which, while they do not constitute a legal justification or excuse for the commission of the offense in question, may be considered, in the estimation of the jury, in fairness and mercy, as extenuating or reducing the degree or a defendant's moral culpability." (*Id*. at 10.) The jury instructions stated further: "The jury is instructed that in determining the appropriate penalties to be imposed in this case that it may consider all evidence introduced and instructions given at both the penalty hearing phase of these proceedings and at the trial of this matter." (*Id*. at 18.) And, most importantly with respect to the issue at hand, the instructions stated:

> As to the Defendant Lisle, Murder of the first degree may be mitigated by any of the following circumstances, even though the mitigating circumstance is not sufficient to constitute a defense or reduce the degree of the crime:
>
> (1)   *The defendant's physically and sexually abusive childhood and adolescence.*

32

(2)　　The defendant's special education status.

(3)　　The defendant's vulnerability to the influence of others.

(4)　　The youth of the defendant at the time of the crime.

(5)　　Any other mitigating circumstances.

Mitigating circumstances do not have to be proven beyond a reasonable doubt.

(*Id*. at 16 (emphasis added).) So, the jury instructions in Lisle's case defined "mitigating circumstances" broadly, stated that the jury could consider all evidence admitted in the trial, and specifically stated, without limitation, that Lisle's physically and sexually abusive childhood and adolescence was a mitigating circumstance to be considered. And, again, the prosecutor did not say that there was any restriction on the jury's consideration of mitigating evidence presented by Lisle.

Lisle cites no authority to the effect that it is prosecutorial misconduct and a violation of the defendant's constitutional right to due process of law for a prosecutor to point out weaknesses of the defendant's mitigating evidence. It was reasonable for the Nevada Supreme Court to conclude that "the prosecutor in the instant matter was merely pointing out that Lisle did not substantiate his claim of abuse as a mitigator and was contrasting the weight of evidence," and that there was no shifting of a burden of proof, and no restriction placed on the jury's consideration of Lisle's mitigating evidence. *See Lisle*, 941 P.2d at 477.

Fair-minded jurists could argue that the Nevada Supreme Court correctly ruled that the prosecutor's argument did not violate Lisle's federal constitutional rights. *See Harrington*, 562 U.S. at 101. Lisle has not shown the Nevada Supreme Court's ruling on this claim to be contrary to, or an unreasonable application of, *Abdul-Kabir*, or any other Supreme Court precedent. The Court will deny Lisle habeas corpus relief on Claim 8B1.

33

1    Turning to Lisle's related claim of ineffective assistance of trial counsel, Lisle

2    asserted this ineffective assistance of counsel claim on the appeal in his first state habeas

3    action (ECF No. 188-2 at 45-47), and the Nevada Supreme Court ruled as follows:

4         Also during his penalty phase closing argument, the prosecutor
          asked the jury to "send a message" to society and other would-be criminals
5         and commented on Lisle's failure to substantiate his claim that he suffered
          from an abusive childhood. Trial counsel objected, and Lisle challenged the
6         prosecutor's statements on direct appeal. We determined that neither
          statement was improper. [Footnote: *Lisle*, 113 Nev. at 705–07, 941 P.2d at
7         476–77.] Our decisions on direct appeal are law of the case. [Footnote: *Hall
          v. State*, 91 Nev. 314, 535 P.2d 797 (1975).]
8

9    (ECF No. 188-5 at 5.) This Court understands the Nevada Supreme Court's ruling to be

10   that, because that court previously held that the prosecutor's argument was not improper,

11   trial counsel did not perform unreasonably in not taking further action, beyond the

12   objection posed with respect to that argument, and Lisle was not prejudiced. The Nevada

13   Supreme Court's ruling in this regard was not contrary to, or an unreasonable application

14   of, *Strickland* or any other Supreme Court precedent. The Court will deny Lisle habeas

15   corpus relief on these parts of Claims 1 and 8H.

16   In his motion for an evidentiary hearing, Lisle requests an evidentiary hearing on

17   the question of whether his counsel was ineffective for failing to object to the prosecutorial

18   misconduct alleged in Claim 8B1. (ECF No. 337 at 5-6.) Here again, however, the alleged

19   prosecutorial misconduct is in the trial record, and the Court determines, based on the

20   record, that the Nevada Supreme Court's denial of relief on the claim was not objectively

21   unreasonable. Lisle's motion for evidentiary hearing is presented in a conclusory fashion,

22   without any indication as to what specific factual question would be addressed and what

23   testimony or other evidence would be presented. Moreover, Lisle does not make any

24   showing that an evidentiary hearing would be justified under 28 U.S.C. § 2254(e). *See* 28

25   U.S.C. § 2254(e)(2); *Ramirez*, 142 S. Ct. at 1739-40. The Court concludes that an

26   evidentiary hearing is unwarranted on these claims.

27
                                    34
28

### 3.   Argument that Jury Should Send a Message (Claims 1 (in Part), 8C, 8H (in Part))

In Claim 8C, Lisle claims that the prosecution committed misconduct by improperly

encouraging the jurors to sentence Mr. Lisle based on passion and prejudice." (ECF No.

292 at 297-99.) Specifically, Lisle contends that the following argument by the prosecutor

was such misconduct:

> Your verdicts here today do a lot of things, one of which is to send a message—a message to society and it's incumbent upon you to think about what that message is going to be. Let me ask you this: Is your message going to be that if you deal drugs, if you carry guns, if you belong to gangs, if you conspire to kill and indeed you do go out and kill that we're going to give you life with the possibility of parole and one day let you perhaps be walking the streets a free person at the same time the Lusch[es] are visiting their son's grave? Is that the message you want to send? If it is, then be lenient on poor Jerry Lopez. Or might you prefer to send a message to the gang-bangers and the dope dealers and the gun carriers and the killers to be that you're not going to tolerate this type of action in our society.

(ECF Nos. 292 at 297-98, 199-3 at 45.)

Defense counsel objected to this argument, and the trial court sustained the

objection and ordered the jury to disregard the argument. (ECF No. 199-3 at 45.)

Lisle asserted this claim on his direct appeal (ECF No. 186-23 at 90-91), and the

Nevada Supreme Court ruled as follows:

> Lisle's attorney made an objection, the judge sustained it, and admonished the jury to disregard those statements. Lisle contends, nonetheless, on appeal that the statements were patently improper.
>
> This court held, "[T]he relevant inquiry is whether the comments were so unfair that they deprived the defendant of due process." *Witter v. State*, 112 Nev. 908, 923, 921 P.2d 886, 897 (1996), *cert. denied*, [520 U.S. 1217] (1997). In *Witter*, during the penalty phase closing argument, the prosecutor commented,
>
> > *It is important to send a message* to people in the community and to would[-]be murderers that there are lines that you do not cross in Nevada; that there is some conduct that simply will not be tolerated and will be met with a very, very severe penalty.
> >
> > . . .
> >
> > *What message does this punishment send today?* Will we tell would[-]be murderers, will we tell this community, that you can

35

1

2

3

4

> kill a man, thrust a knife into his skull 16 times, one time through his skull, 16 times into his body, that you can perpetrate unspeakable, despicable deeds upon his wife in her own car and that you, the husband, can drive upon that crime scene and witness your wife bleeding to death, struggling for your life, *what message does it send* to say the man that perpetrates those crimes can live his life in prison, can write his family, see his family, speak to his family?

5

6

7

8

*Id*. at 924–25, 921 P.2d at 897 (emphasis added). This court held that in a penalty hearing the comments "properly focus on what would be an appropriate punishment under the facts and circumstances of this case, as well as what would be necessary to deter others from committing such a brutal act. These are entirely proper areas for comment." *Id*. at 926, 921 P.2d at 898. As the comments in *Witter* are substantially similar to the ones in the present case, we conclude that Lisle's argument is without merit.

9

*Lisle*, 941 P.2d at 476-77.

10

11

12

13

14

15

16

The Nevada Supreme Court ruled that the prosecutor's argument was not improper as a matter of Nevada state law. With regard to the federal constitutional aspect of the claim, the Nevada Supreme Court denied relief without discussion. Therefore, this Court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington*, 562 U.S. at 102.

17

18

19

20

21

22

This Court finds the send-a-message argument to be improper. That argument tended to draw the jury into imposing the death penalty for reasons unrelated to Lisle or the crimes he committed; in other words, the argument tended to turn the jury away from their duty to make "an individualized determination." *See Zant v. Stephens*, 462 U.S. 862, 879 (1983). However, the question here is not simply whether the prosecutor committed misconduct. As the Supreme Court put it in *Darden*:

23

24

25

26

27

> These comments undoubtedly were improper. But as both the District Court and the original panel of the Court of Appeals (whose opinion on this issue still stands) recognized, it "is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, [699 F.2d 1031, 1036 (1983)]. The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, [643,] 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Moreover, the

28

36

1

2

appropriate standard of review for such a claim on writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.*, at 642, 94 S.Ct., at 1871.

3

477 U.S. at 180-81.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

The prosecutor's offending argument was not extensive or prominent within the context of the prosecution's entire closing arguments. The prosecutor did not misstate evidence. The argument was not amplified by any improper jury instruction, but rather was contradicted by instructions to the jury about what they were to consider in choosing a sentence. (ECF No. 186-6 at 8-9 (regarding consideration of aggravating and mitigating circumstances), 18 ("The jury is instructed that in determining the appropriate penalties to be imposed in this case that it may consider all evidence introduced and instructions given at both the penalty hearing phase of these proceedings and at the trial of this matter"). Moreover, Lisle's counsel objected to the improper argument and the trial court sustained the objection and ordered the jury to disregard it. It is generally presumed that "a jury will follow an instruction to disregard inadmissible evidence." *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (citations omitted), *see also*, *Doe v. Busby*, 661 F.3d 1001, 1017 (9th Cir. 2011) ("A habeas court must presume that jurors follow the jury instructions"). In *Floyd v. Filson*, 949 F.3d 1128 (9th Cir. 2020), the Ninth Circuit Court of Appeals addressed improper prosecution argument much like the send-a-message argument in this case. The Ninth Circuit ruled as follows in that case:

20

21

22

23

24

25

26

27

The prosecution also argued during the penalty phase that the death penalty "sends a message to others in our community, not just that there is a punishment for a certain crime, but that there is justice." This statement inappropriately implies that the jury could sentence Floyd to death to send a message, rather than making "an individualized determination." *Zant v. Stephens*, 462 U.S. 862, 879, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The harm of this statement was mitigated in part by jury instructions that emphasized the jury's responsibility to weigh the specific aggravating and mitigating circumstances of the case. Both the defense and the prosecution also repeatedly emphasized and relied on the specific details of the crime at hand, encouraging the jury to make a determination based on the individual facts of the case. Finally, we agree with the district court's holding that, in context, these comments did not "incite the passions of the jurors" and "did not include any overt instruction to the jury to impose the death

28

37

1
2
3

> penalty . . . to send a message to the community." In light of the other arguments made at trial, and the strong evidence against Floyd, the improper argument by the prosecution did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181, 106 S.Ct. 2464 (quotation marks omitted).

4   *Id*. at 1151-52. Similarly, in this case, in view of the relatively limited nature of the

5   prosecutor's improper argument, the instructions given to the jury, and the fact that the

6   trial court sustained the objection and ordered the jury to disregard the argument, the

7   Court concludes that the improper argument did not so infect Lisle's trial with unfairness

8   as to violate his constitutional right to due process of law.

9          Applying the AEDPA standard, the ultimate question is whether the Nevada

10   Supreme Court's denial of relief on this claim was an unreasonable application of clearly

11   established Supreme Court precedent, or, stated differently, whether fair-minded jurists

12   could disagree about the correctness of the ruling. *See* 28 U.S.C. § 2254(d); *Harrington*,

13   562 U.S. at 101.

14          Lisle cites *Viereck v. United States*, 318 U.S. 236, 247-48 (1943), for the general

15   proposition that "[a] prosecutor . . . commits misconduct by making comments calculated

16   to arouse the passions or prejudices of the jury." (ECF No. 329 at 58.) *Viereck*, though,

17   was not a habeas corpus action involving a state-court conviction and sentence, and there

18   was no analysis in that case of whether the prosecutor's argument constituted a due

19   process violation. Also, the prosecutor's argument in *Viereck* was far different from the

20   argument at issue in this case. The Nevada Supreme Court's denial of relief on this claim

21   was not contrary to any holding in *Viereck* for purposes of 28 U.S.C. § 2254(d)(1).

22          Rather, the Supreme Court precedent to be applied under § 2254(d)(1) appears to

23   be *Darden*, in which, again, the Supreme Court held that prosecutorial misconduct rises

24   to the level of a constitutional violation where it "so infect[s] the trial with unfairness as to

25   make the resulting conviction a denial of due process." 477 U.S. at 181. Applying the

26   AEDPA standard, the Court concludes that fair-minded jurists could argue that the

27

28

Nevada Supreme Court's denial of relief on this claim was consistent with *Darden*. The Court will deny Lisle habeas corpus relief on this part of Claim 8C.

In Claim 8C, Lisle also complains of two other arguments made by the prosecution. He contends that, in making the following argument, the prosecutor "tried to lessen the jurors' responsibility for voting to impose the death penalty by comparing the judicial sanction of the death penalty with Mr. Lisle's actions":

> The death penalty is something that has been approved not only by our society but our Legislatures and upheld by the courts. It is a legal way of doing something that the none of us wants to do. Now, compare and contrast that with the judge and jury sitting over at the other table. Think about how he took Justin Lusch out in the desert and shot him in the back. How he looked Kip Logan in the eye.

(ECF Nos. 292 at 299, 199-3 at 39.) And Lisle notes that "Mr. Seaton also went on to argue, '[t]ell Mr. Lopez there's a new gang in town and [it's] called a jury.'" (ECF Nos. 292 at 299, 199-3 at 46.) But on his direct appeal and his appeal in his first state habeas action, Lisle did not claim prosecutorial misconduct with respect to either of these arguments. (ECF Nos. 186-23, 188-2.) Lisle's claims as to these arguments are therefore subject to denial as procedurally defaulted. In response to the Court's order to show cause, Lisle made no argument that these parts of Claim 8C are not procedurally defaulted, or that he can overcome their procedural default. (ECF No. 477.) The Court will deny relief on these parts of Claim 8C on the ground that they are procedurally defaulted.

In parts of Claims 1 and 8H, Lisle claims that his trial counsel performed ineffectively with respect to the alleged improper prosecution arguments identified in Claim 8C. (ECF No. 292 at 76-77, 304.)

On the appeal in his first state habeas action, Lisle asserted the claim that his trial counsel was ineffective in handling the prosecutor's send-a-message argument (ECF No. 188-2 at 42-45), and the Nevada Supreme Court ruled as follows:

39

1
2
3
4

> Also during his penalty phase closing argument, the prosecutor asked the jury to "send a message" to society and other would-be criminals and commented on Lisle's failure to substantiate his claim that he suffered from an abusive childhood. Trial counsel objected, and Lisle challenged the prosecutor's statements on direct appeal. We determined that neither statement was improper. [Footnote: *Lisle*, 113 Nev. at 705–07, 941 P.2d at 476–77.] Our decisions on direct appeal are law of the case. [Footnote: *Hall v. State*, 91 Nev. 314, 535 P.2d 797 (1975).]

5    (ECF No. 188-5 at 5.)

6    Given that the Nevada Supreme Court determined that the prosecutor's send-a-

7    message argument was not improper under Nevada law, given that Lisle does not cite

8    any authority to support his claim that the argument violated his federal constitutional right

9    to due process of law, and recognizing that trial counsel did in fact object to the argument

10    and the trial court ordered the jury to disregard it, the Court determines that the Nevada

11    Supreme Court's ruling on this ineffective assistance of counsel claim was not objectively

12    unreasonable. The Court will deny Lisle habeas corpus relief on this part of Claims 1 and

13    8H.

14    As for Lisle's claim that his trial counsel were ineffective in handling the other

15    allegedly improper arguments identified in Claim 8C, Lisle did not make any such claim

16    on the appeal in his first state habeas action. (ECF No. 188-2.) And while these comments

17    of the prosecutor were improper, Lisle has not shown that they were so egregious that

18    objection by counsel or a curative instruction would have raised any reasonable

19    probability of a different result at trial. The Court determines that these claims of

20    ineffective assistance of counsel are insubstantial. Lisle does not overcome the

21    procedural default of these ineffective assistance of counsel claims under *Martinez*.

22    These claims will be denied on the ground of procedural default.

23    In his motion for an evidentiary hearing, Lisle requests an evidentiary hearing on

24    the question whether his counsel was ineffective for failing to object to the prosecutorial

25    misconduct alleged in Claim 8C. (ECF No. 337 at 5-6.) Again though, Lisle's motion for

26    evidentiary hearing is presented in a conclusory fashion, without any indication as to what

27
28

40

specific factual question would be addressed and what testimony or other evidence would be presented, and the Court resolves these claims of ineffective assistance of counsel without need for an evidentiary hearing. Also, here again, Lisle does not make any showing that an evidentiary hearing would be justified under 28 U.S.C. § 2254(e). *See* 28 U.S.C. § 2254(e)(2); *Ramirez*, 142 S. Ct. at 1739-40. The Court concludes that an evidentiary hearing is unwarranted on these claims.

### 4.    Argument that Lisle Would Present Danger in the Future (Claims 1 (in Part), 8E, 8H (in Part))

In Claim 8E, Lisle claims that, in closing argument in the penalty phase of his trial, the prosecution committed misconduct by arguing that the death penalty was necessary to prevent Mr. Lisle from killing again. (ECF No. 292 at 301-03.) In Claim 8E itself, and in parts of Claims 1 and 8H, Lisle asserts that his trial counsel were ineffective in their handling of this misconduct. (*Id*. at 76-77, 303, 304.)

Lisle claims that the prosecutor committed misconduct in the following portion of his closing argument, and it rendered his trial unfair and violated his constitutional right to due process of law:

> MR. SEATON [prosecutor]: How he put a .357 caliber bullet into the brain of Kip Logan. Think about the difference between the methodology of the death penalty. His death penalty and your death penalty—society's [death] penalty.  He has the capacity that I asked all of you about. He has demonstrated it willingly and twice and he has the capacity to kill again. And I submit to you the question is not will he but when, if given the opportunity.

> Life with the possibility of parole is laughable as it pertains to Kevin Lisle. Life without the possibility of parole is something which should not be considered. He is going to come into contact with guards in the prison, with inmates. Neither of those groups deserve to die.

> MR. BAKER [Lisle's counsel]: Objection, Your Honor. There's been no evidence of any violence by Kevin Lisle in custody.

> THE COURT: Objection is sustained.

> MR. SEATON: He has the capacity to kill again and the only way— the only way to make sure that he doesn't is to sentence him to death. And think about this for just a moment because we are talking about the

41

1

2

3

4

5

character of a person that you're about to sentence. Think about the character of a person who has the ability to pick up a loaded gun knowing its potential and can point it—that empty barrel at the head of another or the back of another human being and who can squeeze that trigger knowing that a bullet is going to come out and do unimaginable damage. That is a special kind of a human being. That is someone you don't come into contact with in your everyday life. Thank God. Think of who you have been sitting in this courtroom with for the last couple of weeks. A month ago could you have imagined [ever] being in the company of such people?

6

(ECF Nos. 292 at 301-02, 199-3 at 39-40.)

7

8

9

10

Lisle did not assert this claim on his direct appeal. (ECF No. 186-23.) However, on the appeal in his first state habeas action, Lisle arguably asserted both the substantive prosecutorial misconduct claim and the related ineffective assistance of counsel claim. (ECF No. 188-2 at 41-42.) The Nevada Supreme Court appears to have ruled on both:

11

12

13

14

15

16

17

18

19

20

As he discussed Lisle's possible punishments, the prosecutor encouraged the jury to impose a sentence of death. The prosecutor also stated that a death sentence was the only way to ensure that Lisle cannot kill again. Lisle contends that the prosecutor's statements were improper because they misled the jury to believe that death is the presumed sentence and assumed that Lisle would pose a future danger to society. We disagree. The prosecutor did not imply that a death sentence is the presumed sentence. Instead, the prosecutor properly asked the jury to return a sentence of death. [Footnote: *See Williams v. State*, 113 Nev. 1008, 1022, 945 P.2d 438, 446 (1997) *overruled on other grounds by Byford v. State*, 116 Nev. 215, 994 P.2d 700 (2000); *Domingues v. State*, 112 Nev. 683, 698–99, 917 P.2d 1364, 1375 (1996).] Also, a prosecutor may properly base that request on the defendant's possible future dangerousness. [Footnote: *See, e.g.*, *Harte v. State*, 116 Nev. 1054, 1071–72, 13 P.3d 420, 431 (2000); *Redmen v. State*, 108 Nev. 227, 828 P.2d 395 (1992), *overruled on other grounds by Alford v. State*, 111 Nev. 1409, 906 P.2d 714 (1995); *Riley v. State*, 107 Nev. 205, 808 P.2d 551 (1991).] Thus, the prosecutor's statements were not improper, and trial counsel was not ineffective for not challenging them.

21

(ECF No. 188-5 at 4-5.)

22

23

24

25

26

In their answer, with respect to the substantive claim in Claim 8E, Respondents apply the AEDPA standard, citing *Darden* as the applicable Supreme Court precedent. (ECF No. 318 at 52-54.) In his reply, Lisle also treats the substantive claim as exhausted on the appeal in his first state habeas action, and he applies the AEDPA standard as well,

27

28

42

citing no Supreme Court authority beyond *Darden* for his claim that the prosecutor's argument violated his federal constitutional rights. (ECF No. 329 at 68-72.)

The Nevada Supreme Court ruled that the prosecutor's argument was not improper under state law. As to the federal constitutional aspect of the claim, the Nevada Supreme Court denied relief, but did not specifically discuss that aspect of the claim. (ECF No. 188-5 at 4-5.)

The Nevada Supreme Court's denial of relief on this claim was not an unreasonable application of *Darden* or any other Supreme Court precedent. Lisle has not identified any applicable Supreme Court authority for his claim beyond the general standard announced in *Darden*. Respondents, on the other hand, cite *Simmons v. South Carolina*, 512 U.S. 154 (1994). In that case, the Supreme Court stated that future dangerousness is an appropriate consideration for the jury in the sentencing phase of a capital trial. *See Simmons*, 512 U.S. at 163, 165 n.5. Therefore, the Supreme Court authority specific to the kind of alleged prosecutorial argument at issue in Claim 8E is contrary to Lisle's claim. In the sentencing phase of a capital case, prosecutorial argument about the defendant's potential for future violence is not improper. And further, applying *Darden*, the Court determines that fair-minded jurists could argue that Lisle's trial was not rendered unfair, and his federal constitutional rights were not violated, by the prosecutor's argument that Lisle would present a danger in the future. The Court will deny Lisle relief on Claim 8E.

Turning to the related claim of ineffective assistance of trial counsel, because the prosecutor's argument was not improper, the Nevada Supreme Court's ruling that Lisle's trial counsel was not ineffective for not taking further action regarding the prosecutor's argument, beyond the objection trial counsel did make, was not unreasonable. The Court will deny Lisle habeas corpus relief on the ineffective assistance of counsel claims in Claim 8E and parts of Claims 1 and 8H.

Lisle requests an evidentiary hearing on the question of whether his counsel was ineffective. (ECF No. 337 at 5-6.) Again, though, the alleged prosecutorial misconduct is in the trial record, and the Court determines, based on the record, that it was not unreasonable for Lisle's counsel to not take any action beyond the objection. Moreover, the Court determines, from the record, that Lisle was not prejudiced by his counsel not taking any further action as to the prosecutor's argument. Lisle's motion for evidentiary hearing is presented in a conclusory fashion, without any indication as to what specific factual question would be addressed and what testimony or other evidence would be presented. Lisle also does not make any showing that an evidentiary hearing would be justified under 28 U.S.C. § 2254(e). *See* 28 U.S.C. § 2254(e)(2); *Ramirez*, 142 S. Ct. at 1739-40. The Court concludes that an evidentiary hearing is unwarranted on these claims.

### 5.   Cumulative Error from Prosecutorial Misconduct (Claim 8G)

In Claim 8G, Lisle claims that the alleged prosecutorial misconduct should be considered both singly and cumulatively. (ECF No. 292 at 303-04.)

As to the cumulative consideration of such claims, "[t]he Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298, 302-03 (1973)). Thus, "[t]he cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Id*. To evaluate a due process challenge based on the cumulative effect of multiple trial errors, "a reviewing court must determine the relative harm caused by the errors." *Id*. at 927-28.

The Court determines that whether considered individually or cumulatively, the allegedly improper arguments that Lisle raised in claims 8A, 8B1, 8C and 8E were not

such as to "infect the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181. The Court will deny Lisle habeas corpus relief on Claim 8G.

### C.    Aggravating Circumstances (Claims 2A and 2B)

The jury found two statutory aggravating circumstances, supporting imposition of the death penalty: (1) murder committed while engaged in the commission of, or attempt to commit, first-degree kidnapping, and (2) murder committed by a person previously convicted of another murder. (ECF No. 186-8.) In Claim 2A, Lisle claims that the first of these, the kidnapping aggravator, is unconstitutional as applied in this case. (ECF No. 292 at 81-83.) In Claim 2B, Lisle claims that the other aggravator found by the jury—that Lisle had been previously convicted of another murder—is unconstitutional as applied in this case. (*Id*. at 83-243.)

In ruling on Respondents' motion to dismiss, the Court determined that Claims 2A and 2B are potentially barred by the statute of limitations and the procedural default doctrine, but the Court deferred ruling on those issues, because Lisle argued he could overcome the statute of limitations and procedural default bars by showing he is actually innocent of the death penalty, and because the issue of his actual innocence of the death penalty is intertwined with the merits of the claims. (ECF No. 317 at 29-30).

A habeas petitioner can overcome a procedural default or a statute of limitations bar, allowing consideration of the merits of the otherwise barred claim, by showing that he is actually innocent. *See Schlup v. Delo*, 513 U.S. 298, 324-29 (1995); *see also McQuiggin v. Perkins*, 569 U.S. 383, 399 (2013). To demonstrate actual innocence to overcome a procedural bar, a petitioner must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. By means of that evidence, and in light of all the evidence in the case, the petitioner "must show that it is

45

more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327, 329 ("[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt"); *House v. Bell*, 547 U.S. 518, 538 (quoting *Schlup*, 513 U.S. at 327-28) (regarding evidence to be considered). "Based on this total record, the court must make a 'probabilistic determination about what reasonable, properly instructed jurors would do.'" *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 329). "The Court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *House*, 547 U.S. at 538. Meeting this standard "raise[s] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that the trial was untainted by constitutional error," warranting "a review of the merits of the constitutional claims[.]" *Schlup*, 513 U.S. at 317.

The Court determines that Lisle does not show either aggravator to be invalid, or that he is actually innocent of the death penalty. Therefore, the Court denies Claims 2A and 2B as procedurally defaulted and barred by the statute of limitations.

### 1.    The Kidnapping Aggravator (Claim 2A)

In Claim 2A, Lisle claims, as follows, that the kidnapping aggravator is unconstitutional as applied to him:

> The jury was instructed that the definition of first degree kidnapping required that the defendant kidnap the victim "for the purpose of killing the person or inflicting substantial bodily harm upon him . . ." *See* [ECF No. 73-4] at 50. At the penalty phase, the State emphasized that the kidnapping of the victim Lusch was committed in order to perpetrate the killing. *See* ECF No. 199-3 at 26; ECF No. 199-4 at 11-12.
>
> The first-degree kidnapping charge is constitutionally inadequate because it is inconsistent with the murder conviction and the murder conviction it was being used to aggravate. If the purpose of the kidnapping was to commit murder, the murder cannot have occurred in the commission of the kidnapping. That is the murder cannot serve as a predicate to the

kidnapping and then the murder said to have been aggravated by occurring in the commission of the murder [sic - "kidnapping" may have been intended here].

The jury was instructed that "Kidnapping in the First Degree is a specific intent crime." ECF No. 73-4 at 51. It was necessary then, that the State prove that Mr. Lisle specifically intended to kidnap Mr. Lusch for the purpose of killing him. The State emphasized that the evidence demonstrated that the kidnaping was committed only to facilitate the murder: "This jury has found that there was a conspiracy beforehand indicates that these two defendants intended to kill Justin Lusch prior to the time they went over there . . . They went over there with the intent to murder Justin Lusch, and that's what ultimately took place . . ." *See* ECF No. 198-5 at 116–117. Thus, instead of the murder being committed in the [course] of a [kidnapping]; this was a kidnaping committed in the course of a murder[.]

Because the prosecution's theory was that there was no independent purpose to the kidnaping and it was solely intended to facilitate the murder, allowing the kidnaping to be used as an aggravating circumstance to the murder violates the constitutional guarantees of due process of law by disregarding the constitutionally-mandated rule of lenity in interpreting penal statutes and by imposing liability for the aggravating factor that is unconstitutionally vague [ ]. The felony-murder factor must therefore be vacated.

Furthermore, the use of kidnapping to prove murder and murder to prove kidnapping means that the aggravating circumstance of kidnapping does not rationally narrow the class of death-eligible offenders. Instead, all murders that involve holding a victim or moving a victim (beyond what is necessary for the killing) prior to the homicide would make someone death-eligible.

(ECF No. 292 at 81-83.)

Lisle did not assert this claim on his direct appeal or on the appeal in his first state habeas action. (ECF Nos. 186-23, 188-2.) However, Lisle did assert this claim on the appeal in his second state habeas action, and the Nevada Supreme Court denied relief on the claim as follows:

Lisle argues that the felony aggravating circumstance based on kidnapping is invalid because it is premised on the felony-murder rule but the State's theory in this case is inconsistent with the rationale for the felony-murder rule--"'to deter dangerous conduct by punishing as a first degree murder a homicide resulting from dangerous conduct in the perpetration of a felony, even if the defendant did not intend to kill.'" [*Nay v. State*, 123 Nev. 326, 332, 167 P.3d 430, 434 (2007) (quoting *State v. Allen*, 875 A.2d 724, 729 (Md. 2005)); *Payne v. State*, 81 Nev. 503, 506, 406 P.2d 922, 924 (1965); *see People v. Washington*, 402 P.2d 130, 133 (Cal. 1965). According to Lisle, the State's theory at trial was that he kidnapped Lusch to facilitate the murder and therefore the murder did not occur "in the

commission of" a kidnapping; rather, the kidnapping occurred in the commission of the homicide.

Relying primarily on this court's decision in *Nay*, Lisle suggests that this aggravating circumstance is not applicable when the homicide is the purpose behind committing the felony. In *Nay*, we held that a felony-murder conviction cannot be based on a felony that was committed as an afterthought to homicide. 123 Nev. at 333, 167 P.3d at 435. We reasoned that basing a felony-murder conviction on an afterthought felony would not be consistent with the two rationales supporting the felony-murder rule—that the rule's purpose is to deter people from committing dangerous felonies and that the intent to commit the felony provides the malice for the murder—because those rationales hinge on the perpetrator having the intent to commit the felony before or during the killing. *Id*. at 332-33, 167 P.3d at 434–35. Although *Nay* addresses the felony-murder statute, not the felony aggravating circumstance set forth in NRS 200.033(4), the statutes have similar language: felony murder is a murder "[c]ommitted in the perpetration or attempted perpetration of" certain enumerated felonies, NRS 200.030(1)(b), and the felony aggravating circumstance applies when a murder is committed "in the commission of, or an attempt to commit or flight after committing or attempting to commit" certain enumerated felonies, including kidnapping, NRS 200.033(4). Based on this language, Lisle tries to extend the reasoning in *Nay* to support his argument.

We reject Lisle's efforts to extend *Nay* in the manner he suggests for two reasons. First, *Nay* focuses on the felony-murder rule's purpose, but the purposes for the felony-murder rule and the felony aggravating circumstance are not the same. The felony-murder rule's purpose is "to deter dangerous conduct by punishing as a first degree murder a homicide resulting from dangerous conduct in the perpetration of a felony," *Nay*, 123 Nev. at 332, 167 P.3d at 34, (internal quotations omitted), while aggravating circumstances determine which defendants convicted of first-degree murder are eligible for the death penalty, NRS 175.554(3); NRS 200.030(4)(a). Second, *Nay* is focused on the timing of the intent to commit the felony (before or during the murder as opposed to an afterthought), whereas Lisle's argument is more about the nature of the kidnapping in this case—that the murder provided the specific intent for the kidnapping—rather than the timing of that intent because clearly Lisle intended to commit the murder at the time the kidnapping occurred. For these reasons, the analysis in *Nay* does not carry over to the felony aggravating circumstance.

At its core, Lisle's argument is that the murder did not occur in the commission of the kidnapping; instead, the kidnapping occurred in the commission of the murder. We disagree. The felony aggravating circumstance applies when the murder "was committed while the person was engaged . . . in the commission of . . . any . . . kidnapping in the first degree." NRS 200.033(4). And the kidnapping statute provides that kidnapping is in the first degree when a person "willfully seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away a person by any means whatsoever with the intent to hold or detain, or who holds or detains, the person . . . for the purpose of killing the person." NRS 200.310(1). Here, the first-degree kidnapping is based on evidence that Lisle lured Lusch to the desert with the promise of a drug deal so that he

48

1
2
3
4
5
6

could kill Lusch without witnesses. While the kidnapping clearly facilitated the killing and was part of the premeditated plan to kill Lusch, the kidnapping was a separate offense, *see Pascua v. State*, 122 Nev. 1001, 1006, 145 P.3d 1031, 1034 (2006), that was ongoing until Lusch was killed. Therefore the killing occurred "in the commission of" the kidnapping. The kidnapping is not incidental to the murder and the facts clearly established that Lisle was engaged in the commission of kidnapping in the first-degree when he killed Lusch, thereby satisfying the elements for the felony aggravating circumstance. NRS 200.033(4); NRS 200.310; NRS 200.320(1); *see also Bridges v. State*, 116 Nev. 752, 765, 6 P.3d 1000, 1009 (2000). [Footnote set forth below.] We therefore conclude that the felony aggravating circumstance is not invalid on the ground Lisle advances.

7
8

(ECF No. 193-4 at 7-10.) In a footnote, the Nevada Supreme Court addressed the federal constitutional aspects of the claim:

9
10
11
12
13
14

Lisle contends that NRS 200.033(4) is unconstitutionally vague and that imposing death based on this statute would violate due process and the constitutional rule of lenity. NRS 200.033(4) clearly provides a person of ordinary intelligence fair notice that if one engages in the commission of a kidnapping in the first-degree when committing a murder, the murder may be aggravated. *See Holder v. Humanitarian Law Project*, 561 U.S. [1], [18], 130 S.Ct. 2705, 2718 (2010); *accord State v. Casteneda*, 126 Nev. [478], [481], 245 P.3d 550, 553 (2010). Because NRS 200.033(4) is unambiguous, the rule of lenity has no bearing on the construction of this statute. *State v. Lucero*, 127 Nev. [92], [99], 249 P.3d 1226, 1230 (2011).

15
16

(*Id*. at 10 n.1.) The Nevada Supreme Court's ruling was not an objectively unreasonable application of United States Supreme Court precedent.

17
18
19
20
21
22
23
24
25

As the Court understands Lisle's argument, it is that the kidnapping aggravator is unconstitutionally vague and ambiguous, and that it fails to narrow the class of individuals subject to the death penalty. (ECF Nos. 292 at 81-83, 329 at 17-26.) The Court finds that argument to be meritless. The Court agrees with the Nevada Supreme Court that Lisle makes no showing that the kidnapping aggravator is unconstitutionally vague and ambiguous or that it fails to narrow the class of individuals subject to the death penalty. Lisle does not show the kidnapping aggravator to be invalid, and he does not show that he is actually innocent of the death penalty. The Court will therefore deny Lisle's claim in Claim 2A as procedurally defaulted and barred by the statute of limitations.

26
///

27
28

49

1

2

##### 2. The Previously Convicted of Another Murder Aggravator (Claim 2B)

In Claim 2B, Lisle claims that the other aggravator found by the jury—that Lisle had been previously convicted of another murder—was unconstitutional as applied in this case. (ECF No. 292 at 83-243.) Lisle makes two separate arguments in support of this claim. First, Lisle argues that at the time of his conviction, under the statute establishing the aggravator, in order for it to apply, it was necessary that the accused was convicted of the other murder before the murder for which the aggravator is being sought; in this case, Lisle was not yet convicted of the Logan murder (in fact, the Logan murder had not yet occurred) when Lusch was killed. (*Id.* at 83-84.) Second, Lisle asserts that he is actually innocent of the Logan murder and that his conviction for the Logan murder was otherwise obtained in violation of his constitutional rights, and that, therefore, the Logan murder conviction cannot stand as a basis for aggravation of his sentence for the Lusch murder. (*Id.* at 87-243.)

In 1985, in *Gallego v. State*, 711 P.2d 856 (Nev. 1985), the Nevada Supreme Court construed NRS § 200.033(2), the statute establishing the prior-murder-conviction aggravator, and ruled that murder convictions entered after the murder at hand, but before the sentencing—as in Lisle's case—qualify as aggravating circumstances. The Nevada Supreme Court's holding in *Gallego* was as follows:

> Gallego objected to the admission of two murder convictions occurring in Contra Costa County Superior Court of California in 1983 as an aggravating circumstance under NRS 200.033(2). Since the two murders involved in the California judgment were committed subsequent to the murders in the instant case, Gallego contends the former killings do not qualify as an aggravating circumstance under the statute.

> This issue is one of first impression in the State of Nevada. NRS 200.033(2) provides as follows:

> > The only circumstances by which murder of the first degree may be aggravated are:

> > . . .

50

> 2. The murder was committed by a person who was previously convicted of another murder or of a felony involving the use or threat of violence to the person of another.

> Gallego argues that the statute simply provides that a person who is convicted of murder and thereafter commits another murder will have the second offense aggravated by the first. Thus, Gallego concludes that since the June 1983 California convictions did not precede the 1980 killings of Redican and Twiggs, the admission of the former offenses as a statutory aggravating circumstance was error. Gallego is wrong.

> Aggravating circumstances, as defined by the statute, provide direction to the sentencing authority as it considers an appropriate punishment for the defendant. The statute was never intended to operate on the vagaries of conviction sequences. Instead, the focal point is the time of sentencing. The sentencing panel is entitled to consider all relevant aspects of the defendant's criminal background prior to rendering sentence. The fact that Gallego murdered two victims after killing the two victims in the instant case is not relevant to the dictates of the statute. The clear language of the statute required only that Gallego stood convicted of the California murders at the time of the introduction of that evidence in the penalty phase of the present proceeding. It would be both absurd and counterproductive for this Court to construe the plain language of the statute so as to exclude convictions of murders or crimes of violence occurring after the primary offense but prior to the penalty phase of a defendant's trial. This we refuse to do. The trial court did not err.

*Gallego*, 711 P.2d at 863-64.

The language of the statute construed in *Gallego* was identical to the language of the statute at the time of Lisle's trial. (ECF No. 193-4 at 10 n.2.) The Nevada Supreme Court decided *Gallego* on December 20, 1985, more than eight years before the Lusch and Logan killings.

On the appeal in Lisle's second state habeas action, applying its holding in *Gallego*, the Nevada Supreme Court rejected Lisle's claim, as follows:

> Lisle argues that the murder conviction related to Logan's death does not qualify as an aggravating circumstance under the version of NRS 200.033(2) in place during his trial because the Logan conviction did not precede the Lusch murder. [Footnote: At the time of Lisle's original penalty hearing, NRS 200.033(2) provided that first-degree murder may be aggravated if "[t]he murder was committed by a person who was previously convicted of another murder or of a felony involving the use or threat of violence to the person of another." 1993 Nev. Stat., ch. 44, § 1, at 76.] He acknowledges that this argument was rejected in *Gallego v. State*, 101 Nev. 782, 792–93, 711 P.2d 856, 863–64 (1985); *see also Leonard v. State*, 117 Nev. 53, 82, 17 P.3d 397, 415 (2001), but contends that this court failed to provide any statutory construction analysis, "including the application of the

51

1

2

rule of lenity, which is constitutionally required." We disagree. In *Gallego*, this court concluded that NRS 200.033(2)'s plain language only required that the defendant has been convicted of the other murders at the time of the penalty hearing. *Gallego*, 101 Nev. at 792–93, 711 P.2d at 863–64. Since *Gallego*, this court has consistently rejected challenges similar to Lisle's, reaffirming its reasoning in *Gallego*. *E.g.*, [*Leonard v. State*, 117 Nev. 53, 82, 17 P.3d 397, 415 (2001)]; *Calambro v. State*, 114 Nev. 106, 109–10, 952 P.2d 946, 948 (1998); *Emil v. State*, 105 Nev. 858, 865, 784 P.2d 956, 960 (1989); *Crump v. State*, 102 Nev. 158, 162, 716 P.2d 1387, 1389 (1986). As *Gallego* relied on the plain language of NRS 200.033(2), Lisle's argument that the statute is ambiguous is without merit and the rule of lenity does not factor into interpretation of that statute. [*State v. Lucero*, 127 Nev. 92, 99, 249 P.3d 1226, 1230 (2011)]; *Moore v. State*, 122 Nev. 27, 32, 126 P.3d 508, 511 (2006). [Footnote omitted.]

3

4

5

6

7

8

(ECF No. 193-4 at 10-11.)

9

10

11

12

13

14

15

16

17

18

19

20

In this case, Lisle argues, as he did before the Nevada Supreme Court, that the Nevada Supreme Court erred in *Gallego* in not properly applying the rule of lenity in interpreting NRS § 200.033(2). However, a state court's interpretation of state law is authoritative and binds the federal habeas court. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus") (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)); *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). In *Gallego*, in interpreting NRS § 200.033(2), the Nevada Supreme Court held that the rule of lenity did not apply because the statute was unambiguous, and the Nevada Supreme Court reaffirmed that holding in Lisle's case. In both cases, that was an interpretation of a Nevada statute by the Nevada Supreme Court, and this Court is bound by that interpretation.

21

22

23

24

25

26

Lisle argues that the Nevada Supreme Court was constitutionally required in *Gallego* to apply the rule of lenity in interpreting NRS § 200.033(2), and because that court did not do so, Lisle's federal constitutional rights were violated by application of the prior-murder-conviction aggravator in his case more than eight years later. Lisle, however, cites no authority supporting that proposition, and this Court finds this argument to be without merit. The Nevada Supreme Court reasonably ruled that its interpretation of NRS

27

28

§ 200.033(2) in *Gallego* did not render his conviction and sentence for the Lusch murder unconstitutional.

Lisle's other argument that the prior-murder-conviction aggravator was unconstitutionally applied is that he is actually innocent of the Logan murder and that his conviction for the Logan murder was otherwise obtained in violation of his constitutional rights. (ECF No. 292 at 87-243.)

The Nevada Supreme Court addressed this argument, as well, on the appeal in Lisle's second state habeas action, and rejected it as follows:

> Lisle argues that he is actually innocent of Logan's murder because the persons who testified against him did so to secure lighter sentences and that there was insufficient evidence to corroborate their testimony. On this basis, he asserts that he is actually innocent of Logan's murder and therefore the prior murder aggravating circumstance is invalid. We rejected Lisle's challenge to his conviction for Logan's murder. *Lisle v. State*, 113 Nev. 540, 555, 937 P.2d 473, 482 (1997), *clarified on denial of rehearing*, 114 Nev. 221, 954 P.2d 744 (1998). Lisle has presented nothing here to alter that decision, and we therefore conclude that this attempt to invalidate the prior-murder aggravating circumstance fails.

(ECF No. 193-4 at 11 n.3.)

As in state court, so too here, Lisle challenged his conviction for the Logan murder in a separate habeas action in this Court, Case No. 2:03-cv-1005-JCM-DJA. The Court takes judicial notice of the proceedings in Case No. 2:03-cv-1005-JCM-DJA. In that case, on September 8, 2021, the Court denied Lisle's petition and entered judgment in favor of the respondents. (ECF Nos. 292, 293.) Lisle filed a motion to alter or amend the judgment under Fed. R. Civ. P. 59(e), and the Court denied that motion. (ECF Nos. 295, 311.) Lisle has now appealed (ECF Nos. 297, 312), and the case is on appeal in the Ninth Circuit Court of Appeals.

All the challenges to Lisle's conviction for the Logan murder that he asserts in Claim 2B in this case were asserted in his habeas petition in Case No. 2:03-cv-1005-JCM-DJA. (Compare ECF No. 292 at 87-243 with ECF No. 197 in Case No. 2:03-cv-

1005-JCM-DJA.) Those claims have been fully litigated and resolved in favor of the respondents in Case No. 2:03-cv-1005-JCM-DJA. In that case, the court addressed Lisle's claim that he is actually innocent of the Logan murder, and the court denied that claim, both as a means of overcoming the statute of limitations and procedural default bars in that case and as a separate claim. (ECF No. 260 at 15-18, 28-30 (Case No. 2:03-cv-1005-JCM-DJA).) The court also denied relief on all of Lisle's other claims that his conviction for the Logan murder violated his federal constitutional rights. (ECF Nos. 260, 292 (Case No. 2:03-cv-1005-JCM-DJA).) The Court will not revisit those claims here. In view of the proceedings and rulings of this court in Case No. 2:03-cv-1005-JCM-DJA, Lisle's challenges to his conviction for the Logan murder, as bases for Claim 2B, fail.

Lisle does not show the prior-murder-conviction aggravator to be invalid, and he does not show that he is actually innocent of the death penalty. The Court will therefore deny Lisle's claim in Claim 2B as procedurally defaulted and barred by the statute of limitations.

### D. Joinder of Charges (Claim 10)

In Claim 10, Lisle claims that his federal constitutional rights were violated because the trial court erroneously failed to sever the charge of being an ex-felon in possession of a firearm from the charges of conspiracy to commit murder and murder with use of a deadly weapon. (ECF No. 292 at 311.) Lisle's claim is as follows:

> Prior to trial, Mr. Lisle's trial counsel filed a motion to sever Count III [ex-felon in possession of a firearm] from Counts I and II [conspiracy to commit murder and murder with use of a deadly weapon]. Mr. Lisle's attorneys argued that in order for the State to prove Count III, they necessarily had to inform the jury that he had previously been convicted of the felony of conspiring to sell a controlled substance, unduly prejudicing Mr. Lisle. ECF No. 194-1 at 3–4; *see also* ECF No. 130-1 at 1–8[.] Had Mr. Lisle been charged solely with Counts I and II, evidence regarding his prior conviction for conspiring to sell a controlled substance would not have been admissible. The trial court improperly denied the motion to sever the charges. ECF No. 194-1 at 4.

1

2

3

4

5

> The Constitution forbids the general use of prior criminal acts in the guilt phase. *Leavitt v. Arave*, 383 F.3d 809, 829 (9th Cir. 2004). Evidence of prior crimes unduly burdens a jury with the prejudicial inference that an individual has the general character to commit the instant crime and undermines the fundamental safeguard of the presumption of innocence. *Id.*; *see also McKinney v. Rees*, 993 F.2d 1378, 1380 (9th Cir. 1993); *Jammal v. Van de Kamp*, 926 F.2d 919, 929–20 & n.2 (9th Cir. 1992)). By relieving the State of proving essential elements of its charges against Mr. Lisle, the trial court's failure to sever Mr. Lisle's charges violated his right to due process of law.

6

7

8

> Considered singly or in combination of with the other constitutional errors identified in this petition, the trial court's failure to sever the ex-felon in possession charge from the remaining charges had a substantial and injurious effect on Lisle's conviction and death sentence.

9

(ECF No. 292 at 311-12.)

10

11

12

13

Before trial, Lisle moved to have the charge of ex-felon in possession of a firearm tried separately, and the trial court denied that motion. (ECF Nos. 183-13 at 5-7, 185-4 at 12-14, 185-5 at 3.) The record reflects that a copy of the prior judgment of conviction was admitted into evidence. (ECF No. 195-3 at 18-19.)

14

15

Lisle asserted this claim on his direct appeal (ECF No. 186-23 at 55-58), and the Nevada Supreme Court denied relief on the claim, ruling as follows:

16

17

18

19

20

> On December 29, 1995, Lisle filed his motion to sever his ex-felon in possession of a firearm count from the murder and conspiracy counts. Lisle alleged that submitting evidence of his prior felony, conspiracy to sell a controlled substance, as an element of the firearm charge would unduly prejudice the jury against him with respect to the murder and conspiracy charges. On March 21, 1996, the district court denied this motion. Lisle asserts that the district court erred because joinder of the counts was prejudicial.

21

22

23

24

25

26

27

> We have held that joinder decisions are within the district court's discretion and that this court will not reverse that decision absent an abuse of discretion. *Robins v. State*, 106 Nev. 611, 619, 798 P.2d 558, 563 (1990), *cert. denied*, 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 670 (1991). The Ninth Circuit held that "the test is whether joinder was so prejudicial that the trial judge was compelled to exercise his discretion to sever." *United States v. Lewis*, 787 F.2d 1318, 1321 (9th Cir. 1986), *amended by* 798 F.2d 1250 (1986). In addition, the defendant has the burden to prove that the prejudice was "of such magnitude that the defendant's right to a fair trial was abridged." *Id.*
> In *United States v. Jiminez*, 983 F.2d 1020, 1022 (11th Cir. 1993), *cert. denied*, 510 U.S. 925, 114 S.Ct. 330, 126 L.Ed.2d 276 (1993), a charge

28

of being an ex-felon in possession of a firearm was joined with a count charging conspiracy to distribute a controlled substance. Defendant alleged that he was unduly prejudiced by admission of his prior felony because that previous conviction was unrelated to the conspiracy charge. The court held that the lower court did not abuse its discretion by denying defendant's motion to sever counts because the prior felony conviction was not unduly emphasized. *Id*. at 1023.

In the present case, the prior felony conviction was not emphasized. It was merely read in a jury instruction naming the charges against Lisle.

We conclude, therefore, that manifest prejudice did not result from the information that Lisle had previously been convicted of conspiracy to sell a controlled substance. It is doubtful that the jury convicted Lisle of murdering Justin based solely on the fact that Lisle had previous dealings with narcotics. In addition, admissible evidence was presented that Lisle participated in a drug transaction with Sullivan. Therefore, even if the charges had been severed and the jury remained unaware of Lisle's prior felony conviction, the jury would still have been mindful of Lisle's involvement with drug sales.

*Lisle*, 941 P.2d at 469.

Lisle raised this issue again on the appeal in his first state habeas action, relying on Nevada Supreme Court cases decided following his direct appeal, and the Nevada Supreme Court ruled as follows:

. . . Lisle argues that the district court improperly failed to sever the charge of ex-felon in possession of a firearm from the murder charges. We rejected this claim on direct appeal. [Footnote: *Lisle*, 113 Nev. at 693–94, 941 P.2d at 469.] Later, in *Brown v. State*, [Footnote: 114 Nev. 1118, 1126, 967 P.2d 1126, 1131 (1998)], we held that in "future cases where the State seeks convictions on multiple counts, including a count of possession of a firearm by an ex-felon pursuant to NRS 202.360, … severance of counts pursuant to NRS 202.360 is required." Although *Brown* announced a prospective rule, we applied its reasoning and granted relief in a then-pending case, *Schoels v. State* [Footnote: 115 Nev. 33, 975 P.2d 1275

(1999)]. Lisle compares his case to *Schoels* and argues that *Brown* should be retroactively applied to him. We disagree.

The circumstances of *Schoels* are completely different from those in this case. Before trial, Schoels moved to plead guilty to the charge of ex-felon in possession of a firearm; the district court denied the motion because it would be "highly detrimental to the state." [Footnote: *Id*. at 35–36, 975 P.2d at 1277.] Other than the unfair prejudicial effect of informing the jury that Schoels was an ex-felon, we saw no support in the record for the district court's finding. [Footnote: *Id*. at 37, 975 P.2d at 1277.] Thus, we concluded that the district court abused its discretion in refusing to accept School's guilty plea and that the error undermined the reliability of the first-degree murder verdict. [Footnote: *Id*. at 37–38, 975 P.2d at 1277–78.]

56

Although the district court also denied Schoel's motion to sever the charge, we reached the issue independently of *Brown* and granted relief based on the district court's refusal to accept the guilty plea. Here, Lisle did not attempt to plead guilty, he only requested severance. Thus, *Schoels* does not apply. Moreover, on direct appeal we determined that Lisle was not prejudiced by the jury being informed that he was previously convicted of conspiracy to sell a controlled substance and, therefore, the district court did not abuse its discretion in denying Lisle's motion to sever. [Footnote: *Lisle*, 113 Nev. at 694, 941 P.2d at 469.]

(ECF No. 188-5 at 8-10.)

Lisle has not cited any Supreme Court authority establishing that joinder of charges in a criminal case can deny a defendant's federal constitutional rights, and the Court is aware of none. *See Grajeda v. Scribner*, 541 F. App'x 776, 778 (9th Cir. 2013) ("The Supreme Court has not held that a state or federal trial court's denial of a motion to sever can, in itself, violate the Constitution"); *Hollie v. Hedgpeth*, Case No. 10–55331, 2011 WL 5142956, at *1 (9th Cir. Oct. 31, 2011) ("The Supreme Court has never held that a trial court's failure to provide separate trials on different charges implicates a defendant's right to due process"). Indeed, the United States Supreme Court has held that "[i]mproper joinder does not, in itself, violate the Constitution." *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986). The Supreme Court in *Lane* stated that "misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial," but the Ninth Circuit has characterized that statement as dicta not constituting clearly established law under Section 2254(d)(1). *See id.; Brewer v. Adams*, 412 F. App'x 30, 32 (9th Cir. 2011); *Collins v. Runnels*, 603 F.3d 1127, 1132 (9th Cir. 2010). *Lane* does not clearly establish federal law within the meaning of 28 U.S.C. § 2254(d) (1), regarding when, if ever, severance is constitutionally required. It therefore appears that there is no controlling Supreme Court precedent, and Lisle's claim fails for this reason.

Moreover, even if Lisle's claim was not foreclosed for lack of controlling Supreme Court precedent, this Court would still find that the claim fails. This Court agrees with the

57

Nevada Supreme Court that Lisle does not show that his trial was fundamentally unfair because of the joinder of the firearm charge with the murder and conspiracy charges. In the guilt phase of the trial, there was strong evidence showing that Lisle was involved in drug sales; the evidence of Lisle's prior conviction for conspiracy to sell a controlled substance added little to that. Moreover, the murder and conspiracy to commit murder charges were of a completely different nature, and much more serious, than Lisle's prior conviction for conspiracy to sell a controlled substance. It is inconceivable that the jury was influenced in any significant manner in its finding of guilt on the murder and conspiracy to commit murder charges by his prior conviction for conspiring to sell a controlled substance.

With respect to the penalty phase of the trial, regarding the jury's finding that Lisle was eligible for the death penalty—that is, that there were aggravating circumstances and the aggravating circumstances were not outweighed by mitigating circumstances—the jury was instructed by the trial court how to make that decision, and there is no reason to believe that the jury considered Lisle's prior conviction for conspiring to sell a controlled substance. And regarding the jury's selection of the death penalty, even if the charges had been severed, the jury would have learned of Lisle's criminal record before deciding upon the sentence, so there was no unfairness caused by the joinder of charges at the selection-of-penalty stage.

The Court concludes that the Nevada Supreme Court's denial of relief on this claim was not an unreasonable application of Supreme Court precedent and was not otherwise objectively unreasonable. The Court will deny Lisle relief on Claim 10.

**E.      Joinder of Defendants (Claim 16)**

In Claim 16, Lisle claims that his federal constitutional rights were violated "because the trial court erroneously denied Mr. Lisle's motion to sever his trial from that

of his co-defendant." (ECF No. 292 at 371-81.) Lisle also claims, in Claim 16, that his trial counsel were ineffective with respect to their handling of this issue. (*Id*. at 380-81.) Claim 16 includes seven subclaims, designated by Lisle in his fourth amended petition as Claims 16A through 16G.

In Claim 16A, Lisle claims that the trial court's denial of his motion to sever his trial from Lopez's trial violated his federal constitutional right to confrontation because of testimony by witness John Melcher regarding statements made by Lopez to Melcher out of Lisle's presence. (*Id*. at 372-73.)

Before trial, Lisle filed a motion to sever his trial from Lopez's trial. (ECF No. 183-13.) His motion was based on his expectation that Melcher would testify that Lopez told him that he saw Lisle shoot Lusch; Lisle argued that admission of that testimony would violate his constitutional right of confrontation under *Bruton v. United States*, 391 U.S. 123 (1968). (*Id*. at 4-5.) The prosecution filed an opposition to Lisle's motion, citing *Richardson v. Marsh*, 481 U.S. 200 (1987), for the proposition that admission of a non-testifying codefendant's out-of-court confession does not violate the defendant's right to confrontation where the trial court instructs the jury not to use the confession against the defendant and the confession is redacted to eliminate not only the defendant's name, but also any reference to the defendant's existence. (ECF No. 183-14 at 10-11.) The prosecution suggested, "[a] redaction of co-defendant Lopez's statement to John Melcher could very easily cure any problems defendant Lisle complains of." (*Id*. at 11.) Lisle filed a reply, arguing that "[m]erely substituting a neutral pronoun for the Defendant's name does not protect [Lisle's] rights when it is clear from the statements that the neutral pronoun refers to the Defendant." (ECF No. 183-15 at 3.) Lisle argued in the reply that it would be apparent that the unnamed person referred to in a redacted statement of Lopez would be Lisle. (*Id*. at 4-5.) The trial court heard argument on the motion to sever (ECF No. 185-4 at 3-12), and then denied the motion and ordered that Lopez's statement to

Melcher would be redacted to replace Lisle's name with a neutral pronoun. (ECF Nos. 185-4 at 10-12, 185-5 at 3.)

At trial, the testimony of Melcher, "redacted" to refer to Lisle with nonidentifying phrases such as "the other guy," was as follows:

Q.    (By Mr. Seaton [prosecutor]): When did you meet Mr. Lopez?

A.    Around September, beginning of September.

Q.    Could it have been as early as late August?

A.    I believe so.

Q.    So it would be late August, early September of what year?

A.    '94.

Q.    '94. Did you take a trip to California with Mr. Lopez?

A.    Yes.

Q.    Prior to that trip were you in a place where you had a conversation with him?

A.    Yes.

Q.    Where was that place?

A.    Sophia Martinez.

Q.    At her house or apartment?

                              *    *    *

A.    Yes.

Q.    When you had the conversation with Mr. Lopez, where were you within her house?

A.    Me and Mr. Lopez, we were in the front living room.

Q.    In the living room?

A.    Yes.

Q.    Were there any other people in the living room at that time?

A.    Yes—no, I mean.

Q.   But there were other people in the house—

A.   Yes.

Q.   —but not in the living room, correct?

A.   Yes.

Q.   Did he say anything to you about having gone to an individual's house to pick him up?

A.   Yes.

                              *   *   *

Q.   (By Mr. Seaton [prosecutor]):  What did he say?

A.   He said that him and this guy went to go pick this guy up and they went out. They stopped the car. The person that was in—I guess in the passenger's seat got out of the car, went to the back of the car.

Q.   Who got out of the car—the other guy or Mr. Lopez?

A.   The other guy.

Q.   And who else got out of the car?

A.   Lusch. I guess was Lusch. He didn't mention no name at that time.

Q.   But later did he mention a name?

A.   Yes.

Q.   So the other guy and Mr. Lusch got out of the car?

A.   They went to the back of the car.

Q.   How was Mr. Lopez able to watch this? Did he tell you?

A.   Through the rear view mirror.

Q.   What did he say he saw?

A.   Saw this person start shoot this guy. He said—

Q.   The guy being shot was Mr. Lusch?

A.   Yes.

Q.   The other guy is the one who was doing the shooting?

A.   Yes.

                              61

Q.     And did he say that he actually saw the shooting?

A.     Yes.

Q.     What was your reaction when he said these things to you?

A.     Like what? I don't know nothing about it really and he told me, you don't know nothing about the murder of the chief's son and I told him no.

Q.     The murder of the chief's son?

A.     Yes.

Q.     Is that how you understood it to be Justin Lusch that was the other person in the car?

A.     Yes.

Q.     When Mr. Lopez told you these things, how did he act?

A.     No big deal.

Q.     No big deal?

A.     No big deal.

Q.     Was he excited about it?

A.     Not really.

Q.     Was he worried about it?

A.     I didn't see it.

Q.     Did he ever say anything that he didn't have anything to do with it?

A.     Not that I remember.

(ECF No. 197-3 at 14-17.)

Lisle asserted this claim on his direct appeal (ECF No. 186-23 at 52-55), and the Nevada Supreme Court ruled as follows:

On December 29, 1995, Lisle filed a motion to sever his trial from that of Lopez. He based this motion on the statement that Lopez made to Melcher, incriminating Lisle; specifically, Lopez told Melcher that he observed Lisle shoot Justin at the rear of the car. On March 21, 1996, the district court filed its order denying Lisle's motion. However, the court ordered that when Melcher testified as to Lopez's statement, the statement

62

1
2

must be redacted so as to exclude any reference to Lisle. Accordingly, when Melcher testified, he stated that Lopez observed "the other guy" shoot Justin.

3
4
5
6
7

Lisle cites *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), for the proposition that Lisle's constitutional right to cross-examine the witness was violated when Lopez's hearsay statements, which inculpate Lisle, were admitted. However, Lisle fails to cite *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). *Richardson* held that if a statement is redacted to exclude defendant's existence and the statement is not incriminating on its face, but only when linked with other evidence introduced later at trial, then a limiting instruction will cure any prejudice. *Id*. at 211, 107 S.Ct. at 1709. Therefore, a redacted version of the statement may be admitted. *Id*.

8
9
10
11

The United States Court of Appeals for the Ninth Circuit extended this concept to allow defendant's name to be replaced by a neutral word, such as "individual." Therefore, although the statement referred to defendant's existence, the court allowed it to be admitted as long as his name was not used. *United States v. Enriquez–Estrada*, 999 F.2d 1355, 1359 (9th Cir. 1993).

12
13
14

Here, Melcher's testimony that Lopez observed "the other guy" shoot Justin is not incriminating on its face because it does not, in and of itself, reference Lisle. Only when other evidence introduced at trial linked that statement to Lisle did it incriminate him. Under *Richardson* and *Enriquez–Estrada*, this is not a violation of Lisle's constitutional rights.

15
16
17
18
19
20

Lisle also cites *Stevens v. State*, 97 Nev. 443, 444, 634 P.2d 662, 663 (1981), which reversed a co-defendant's conviction because "[i]t appears likely that the jury read the appellant's name into the blanks" in her co-defendant's statement. This case is distinguishable because no direct evidence, only circumstantial evidence, was introduced of Stevens' involvement in the crime; therefore, her co-defendant's statement, although redacted, was extremely damaging. In the instant matter, regardless of Lopez's statement, four other witnesses heard Lisle confess to killing Justin. [Footnote: These witnesses are Evans, Prince, Vanella's mother, and Melcher.] *See id*. at 445, 634 P.2d at 664 (holding harmless error analysis applies).

21

Accordingly, we conclude that the district court did not abuse its discretion in denying Lisle's motion to sever.

22

*Lisle*, 941 P.2d at 468-69.

23

Lisle asserted the claim, again, on the appeal in his first state habeas action (ECF

24

No. 188-2 at 52-59), as the Supreme Court had decided the case of *Gray v. Maryland*,

25

523 U.S. 185 (1998), on June 17, 1997, which was after the Nevada Supreme Court ruled

26
27
28

on Lisle's direct appeal but before his conviction became final. (ECF No. 317 at 14.) The

Nevada Supreme Court then ruled as follows on the claim:

> Lisle . . . claims that his right to confront and cross-examine witnesses against him was violated when the district court admitted Lopez's out-of-court confession that inculpated Lisle. Although Lisle concedes that this court rejected this claim on direct appeal, he contends that [*Gray*], a recent United States Supreme Court opinion, requires us to remand for a new trial. We disagree. *Gray* does not alter our prior analysis of this issue. [Footnote: We address this issue because Lisle's direct appeal was not final when *Gray* was decided. *See Garner v. State*, 116 Nev. 770, 788 & n.8, 6 P.3d 1013, 1025 & n.8 (1999).]
>
> In *Gray*, a police detective that read the codefendant's confession into the record substituted the word "deleted" or "deletion" for the non-confessing defendants' names. [Footnote: *Gray*, 523 U.S. at 188.] Immediately after the detective read the confession, the prosecutor asked, "'after he gave you that information, you subsequently were able to arrest [one of the non-confessing defendants]; is that correct?' The officer responded, 'That is correct.'" [Footnote: *Id*. at 188–89.] The Court compared the redacted confession to the ones at issue in [*Bruton*] and [*Richardson*]. And the Court determined that a confession with obvious deletions has the same impact as a confession that names the non-confessing defendant because (1) the jury will often realize that the confession refers specifically to the defendant, (2) the obvious deletion could call the jury's attention to the removed name, and (3) they function the same way grammatically. [Footnote: *Gray*, 523 U.S. at 192–94.] Therefore, the Court held that a confession with obvious deletions falls under *Bruton*'s protective rule. [Footnote: *Id*. at 195.]
>
> Unlike *Gray*, the confession in this case was not obviously altered. Melcher testified that Lopez told him that Lopez and "another guy" drove the victim to the desert and that "the other guy" shot the victim. The jury could have reasonably thought that when discussing the crime with Melcher, Lopez omitted his accomplice's name. Thus, even under *Gray's* alteration test, the confession alone is not incriminating.
>
> Lisle argues that the context in which Lopez's redacted confession was admitted made it obvious that he was "the other guy." However, the *Gray* decision was not based on the context in which the redacted confession was admitted but the manner in which it was redacted. The Supreme Court's analysis focused on the close resemblance of the
>
> unredacted confession and the one with obvious alterations, holding that they are functionally equivalent. [Footnote: *Id*. at 192–95.] In fact, the Supreme Court held that the obviously altered statement violated Gray's Sixth Amendment rights independently of the prosecutor's follow-up question. [Footnote: *Id*. at 193.] Our prior analysis remains sound because *Gray* did not affect the primary holding in *Richardson*. [Footnote: *See generally Gray*, 523 U.S. 185.] That is, it is not improper to admit a codefendant's confession redacted so that it does not facially incriminate

the other defendant although the confession becomes incriminating when linked with other evidence introduced at trial. [Footnote: *See Richardson*, 481 U.S. at 208-209.] Thus, we conclude that Lisle is not entitled to any relief on this ground.

(ECF No. 188-5 at 6-8.)

Under the AEDPA standard, the question is whether the Nevada Supreme Court's application of *Bruton*, *Richardson*, and *Gray* is objectively unreasonable, that is, whether it is beyond reasonable argument that the Nevada Supreme Court misapplied those cases. This Court determines that it is not. A fair-minded jurist could reasonably argue that the Nevada Supreme Court correctly applied *Bruton*, *Richardson*, and *Gray*.

In *Richardson*, the Supreme Court stated the basic prohibition of the Confrontation Clause, and the problem of out-of-court confessions in joint trials, as follows:

> The Confrontation Clause of the Sixth Amendment, extended against the States by the Fourteenth Amendment, guarantees the right of a criminal defendant "to be confronted with the witnesses against him." The right of confrontation includes the right to cross-examine witnesses. *See Pointer v. Texas*, 380 U.S. 400, 404, 406–407, 85 S.Ct. 1065, 1068, 1069–1070, 13 L.Ed.2d 923 (1965). Therefore, where two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand.

*Richardson*, 481 U.S. at 206.

In *Gray*, the Supreme Court described its holding in *Bruton* as follows:

> *Bruton* involved two defendants accused of participating in the same crime and tried jointly before the same jury. One of the defendants had confessed. His confession named and incriminated the other defendant. The trial judge issued a limiting instruction, telling the jury that it should consider the confession as evidence only against the codefendant who had confessed and not against the defendant named in the confession. *Bruton* held that, despite the limiting instruction, the Constitution forbids the use of such a confession in the joint trial.

*Gray*, 523 U.S. at 188. Notably, in *Bruton*, the codefendant's out-of-court statement was indisputably inculpatory of the defendant on its face and it was not redacted or otherwise altered to prevent it from implicating the defendant. *See* 391 U.S. at 123-26.

In *Richardson*, the Supreme Court considered the use of a redacted confession in a joint trial. As the *Richardson* Court put it, the issue was "whether *Bruton* requires the same result when the codefendant's confession is redacted to omit any reference to the defendant, but the defendant is nonetheless linked to the confession by evidence properly admitted against him at trial." 481 U.S. at 202. The *Richardson* Court explained the essential difference between that case and *Bruton*:

> In *Bruton*, the codefendant's confession "expressly implicat[ed]" the defendant as his accomplice. [*Bruton*, 391 U.S. at 124, n.1]. Thus, at the time that confession was introduced there was not the slightest doubt that it would prove "powerfully incriminating." *Id*., at 135, 88 S.Ct., at 1627. By contrast, in this case the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony).

*Id*. at 208. The *Richardson* Court held "that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id*. at 211. The Court added, "[w]e express no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." *Id*. at 211 n.5.

In *Gray*, "the prosecution . . . redacted the codefendant's confession by substituting for the defendant's name in the confession a blank space or the word 'deleted,'" and the Supreme Court addressed the question of the effect of such obvious alterations. 523 U.S. at 188. The Court described the factual background in *Gray* as follows:

> In 1993, Stacey Williams died after a severe beating. Anthony Bell gave a confession, to the Baltimore City police, in which he said that he (Bell), Kevin Gray, and Jacquin "Tank" Vanlandingham had participated in the beating that resulted in Williams' death. Vanlandingham later died. A Maryland grand jury indicted Bell and Gray for murder. The State of Maryland tried them jointly.

> The trial judge, after denying Gray's motion for a separate trial, permitted the State to introduce Bell's confession into evidence at trial. But the judge ordered the confession redacted. Consequently, the police detective who read the confession into evidence said the word "deleted" or "deletion" whenever Gray's name or Vanlandingham's name appeared.

66

Immediately after the police detective read the redacted confession to the jury, the prosecutor asked, "after he gave you that information, you subsequently were able to arrest Mr. Kevin Gray; is that correct?" The officer responded, "That's correct." The State also introduced into evidence a written copy of the confession with those two names omitted, leaving in their place blank white spaces separated by commas. The State produced other witnesses, who said that six persons (including Bell, Gray, and Vanlandingham) participated in the beating. Gray testified and denied his participation. Bell did not testify.

When instructing the jury, the trial judge specified that the confession was evidence only against Bell; the instructions said that the jury should not use the confession as evidence against Gray. The jury convicted both Bell and Gray.

*Id*. at 188-89 (citations to record on appeal omitted). The *Gray* Court held that "[r]edactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration, however, leave statements that, considered as a class, so closely resemble *Bruton*'s unredacted statements that, in our view, the law must require the same result." *Id*. at 192.

The *Gray* Court recognized that *Richardson* "placed outside the scope of *Bruton*'s rule those statements that incriminate inferentially," and also recognized that inferences were required for the out-of-court statement to incriminate the defendant in that case, but still found the statement in *Gray* to violate the defendant's right of confrontation. *Id*. at 195-96. With respect to this point, the Court distinguished *Gray* from *Richardson*:

. . . *Richardson* must depend in significant part upon the kind of, not the simple fact of, inference. *Richardson*'s inferences involved statements that did not refer directly to the defendant himself and which became incriminating "only when linked with evidence introduced later at trial." 481 U.S., at 208, 107 S.Ct., at 1707. The inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial. Moreover, the redacted confession with the blank prominent on its face, in *Richardson*'s words, "*facially* incriminat[es]" the codefendant. *Id*., at 209, 107 S.Ct., at 1708 (emphasis added). Like the confession in *Bruton* itself, the accusation that the redacted confession makes "is more vivid than inferential incrimination, and hence more difficult to thrust out of mind." 481 U.S., at 208, 107 S.Ct. at 1707.

67

*Id.* at 196. The Court in *Gray* held that the defendant's Sixth Amendment right of confrontation was violated by admission of the codefendant's obviously redacted confession.

In contrast to the statement considered in *Gray*, Melcher's testimony about Lopez's statement was not obviously altered. The Nevada Supreme Court noted this:

> Unlike *Gray*, the confession in this case was not obviously altered. Melcher testified that Lopez told him that Lopez and "another guy" drove the victim to the desert and that "the other guy" shot the victim. The jury could have reasonably thought that when discussing the crime with Melcher, Lopez omitted his accomplice's name. Thus, even under *Gray's* alteration test, the confession alone is not incriminating.

(ECF No. 188-5 at 7.) This is a reasonable distinction. It appears likely that the jury did not realize that Melcher's testimony about Lopez's statement had been redacted, altered, or limited in any way; the jury likely understood Melcher to be saying that Lopez used the phrase "the other guy," and did not tell him in that conversation who the other guy was. In *Gray*, the Supreme Court emphasized the obviousness of the redactions of the statement at issue in that case. In *Gray*, a portion of the statement was redacted to read "[m]e, deleted, deleted and a few other guys" and the Court suggested that a better alteration would have had the statement simply read "[m]e and a few other guys." 523 U.S. at 185; *see also U.S. v. Peterson*, 140 F.3d 819, 822 (9th Cir. 1998) (discussing this part of *Gray* and stating that "*Gray* clarifies that the substitution of a neutral pronoun or symbol in place of the defendant's name is not permissible if it is obvious that an alteration has occurred to protect the identity of a specific person"). The statement in this case was not obviously altered; it was, in that respect, like the alteration suggested in *Gray*. A fair-minded jurist could argue that this distinguishes this case from *Gray* and makes it more like *Richardson*.

Moreover, Lopez's out-of-court confession, as described to the jury by Melcher (quoted in its entirety above), did not, on its face, implicate Lisle. As Melcher relayed it to

the jury, Lopez told him that the "other guy" shot Lusch. Lopez's statement, as relayed by Melcher, did not indicate who "the other guy" was. It was only as a result of other evidence that it would have been apparent to the jury that Lisle was the "other guy." In *Gray*, the Supreme Court stated that this, too, remains an important factor to be considered. *See* 523 U.S. at 195 ("We concede that *Richardson* placed outside the scope of *Bruton*'s rule those statements that incriminate inferentially") (citing *Richardson*, 418 U.S. at 208). Applying an analysis suggested in *Gray*: If Melcher's testimony had been the very first evidence introduced at Lisle's trial, Lopez's out-of-court statement would not have implicated Lisle. *See Gray*, 523 U.S. at 196. A fair-minded jurist could argue that this is another key difference from the statement considered in *Gray*.

Therefore, the Court concludes that it could reasonably be argued that, under *Bruton*, *Richardson*, and *Gray*, the denial of Lisle's motion to sever his trial from Lopez's trial did not result in a violation of his constitutional right to confrontation. The Court will deny Lisle habeas corpus relief on Claim 16A.

In Claims 16B and 16C, Lisle makes two related claims: that the trial court's denial of his motion to sever his trial from Lopez's trial violated his federal constitutional right to due process of law because, at their joint trial, the prosecution introduced evidence implicating Lisle in the Logan murder, and, in an attempt to cure that, the trial court required the prosecution to introduce false testimony of prosecution witness Larry Prince. (ECF No. 292 at 373-74.) These claims, as set forth in Lisle's fourth amended habeas petition, are as follows:

> The failure to grant a severance also resulted in the erroneous admission of evidence of the Logan homicide. As stated in Claim Three, the State erroneously adduced prejudicial evidence of an unrelated homicide in the guilt phase of Mr. Lisle's trial. The State connected Mr. Lisle to this homicide through the testimony of William Skupa, Adam Evans, and Larry Prince. Mr. Lisle hereby incorporates the allegations set forth in Claim Three of this Petition as if set forth fully herein.
>
> The trial court noted the prejudicial impact Mr. Prince's references to the Logan homicide had on the jury. The court warned the State against

eliciting testimony regarding the Logan homicide. ECF No. 197-1 at 90-91. The trial court erroneously denied Mr. Lisle's renewed motion for a mistrial based on the error. Rather, the trial court directed the State to have Mr. Prince falsely testify that ten or fifteen other people were in Mr. Prince's apartment prior to the Logan homicide.

\* \* \*

The failure to grant a severance also resulted in the trial court ordering Larry Prince to present false testimony. Mr. Lisle hereby incorporates the allegations set forth in Claim Five as if set forth fully herein. As stated in that claim, the trial court noted that to not remedy the error from the State's repeated references to the Logan homicide would be reversible error. The trial court, in an effort to remedy the error, ordered Mr. Prince to falsely testify that ten to fifteen other white male adults lived with him in his apartment. ECF No. 197-1 at 92.

The failure to grant a severance tainted the integrity of the judicial system. False testimony was intentionally directed by the trial court. A conviction and death sentence by such a system is fundamentally unfair and a violation of due process of law. The trial court's order to put on false testimony also deprived Mr. Lisle of an opportunity to cross-examine the State's evidence against him. The false testimony deprived Mr. Lisle of an opportunity to evaluate the reliability of Mr. Prince's testimony under adversarial procedures. Finally, the order that Mr. Prince testify falsely required the presentation of inherently unreliable evidence; the use of this evidence in capital sentencing violates the Eighth Amendment's prohibitions on cruel and unusual punishments. Accordingly, the failure to sever Mr. Lisle's trial from Mr. Lopez's trial had a substantial and injurious effect on Mr. Lisle's conviction and death sentence.

(*Id.*)

The trial court had ordered that the prosecution be precluded from introducing evidence implicating Lisle in the Logan murder. (ECF Nos. 185-4 at 36-38, 185-5.) Lisle alleges though that the testimony of Evans, William S. Skupa, and Prince, violated that order. Skupa was Evans's attorney; he testified that Evans, Melcher, and an adult male were charged with Logan's murder, and that the adult was convicted of that murder. (ECF No. 196-2 at 165, 174.) Evans testified that an adult white male fired the shot that killed Logan and was convicted of that murder. (ECF No. 197-1 at 32-36.) Prince testified as follows:

> Q. [by the prosecutor]    Was there another case as well that you were going to be able to lend testimony to?
>
> A.    Yes.

70

Q.     Did that case have to do with a situation where Adam Evans and John Melcher along with another male adult were charged with a murder?

A.     Yes.

Q.     Are you aware that that happened in an automobile?

A.     Yes.

Q.     Did you have certain information about that crime?

A.     No more than general information. I had no privileged information.

Q.     Did you have information that you could share with a jury in the trial of that particular crime?

A.     Some of the events before the crime in my apartment.

Q.     Did you, in fact, so testify in that trial?

A.     Yes.

Q.     And Adam and John Melcher, did they testify as well?

A.     Yes.

(ECF No. 197-1 at 88-89.)

After that testimony, the trial judge was apparently concerned about Prince's disclosure that he had information about the Logan murder that he learned from "[s]ome of the events before the crime in my apartment," and she spoke with counsel about this matter during a break and without the jury present:

THE COURT:        The record will reflect that the jury has retired from the courtroom.

The reason I asked you to stay is, Mr. Seaton [prosecutor], you are getting right on the line here, and I'm going to tell you to back off of it and back off of it by about 10 feet. You have now told the jury that not only was it an unnamed adult, you've given it a sex and a race. That's not necessary and –

MR. SEATON [prosecutor]:        How did I give it a sex and a race?

THE COURT:        You said an unidentified white male was the last one that you went—last description in front of Adam Evans, and now you are narrowing it down to someone that Larry Prince had in his apartment, and I'm telling you you're on the line, and you better get off of it, and you

71

better figure out something during the lunch hour to back that out and fix it because you're right on the line.

MR. SEATON:          Just to let the Court know, I had no intention to say white male.

THE COURT:          But you did.

MR. SEATON:          It's like when we talk about the guilt phase. I did that accidently because it's just words that come out. We have tried real hard –

THE COURT:          Think of some remedial thing to do. We're recessed until 1:15.

MS. BLASKEY [Lisle's counsel]:   Based on the comments that you made and based on what transpired this morning, we are compelled to ask the Court for a mistrial, and I hope that for the years that our performance is reviewed in this case, it will be understood that we were in a position where we cannot possibly object in a contemporaneous fashion. It simply would have the effect of drawing more attention to the question that we find so objectionable.

THE COURT:          Your objection at this point in time is deemed to be timely, and you're right. If you had objected at that moment, it would have made it even worse than it is now. Your motion for mistrial is denied at this moment.

You craft something to get away from this, back up somehow.

MR. SEATON:          Before we leave while it's on our minds, just let me state the only thing I'm going to be able to come up with, and I have no difficulty with this, is to simply say to the jury that the phraseology was improper on my part and –

THE COURT:          You have Mr. Prince testify to 15 other people that were in that apartment prior to this time, or ten other people, and I don't even care if it's correct testimony or not correct testimony, but you put more people in that apartment.

MS. BLASKEY:          Judge, for the record my motion for mistrial I'd like to make it twice, based on Mr. Seaton's comments of the white male and also based on Mr. Prince's testimony that he had knowledge because of the people who were living in his apartment. It's very clear that my client was living there.

THE COURT:          It's also going to be very clear when the jury comes back that a number of other people were living there, and I don't care if you have to fabricate these people. I don't care if you have to fabricate these people. I don't care where you get them from, but they're going to live there. So we'll be in recess until 1:15.

72

(*Id*. at 90-92.) After the recess, the discussion continued without the jury present:

MS. BLASKEY:      Your Honor, prior to the noon recess we moved for a mistrial, because of a comment of Mr. Seaton elicited during Larry Prince's testimony that a white male was actually the shooter in the other case. That's information that we have gone to great length to keep the jury from piecing together. We would move for mistrial based on that and of necessity that excludes Mr. Lopez.

It's my understanding Mr. Schieck [Lopez's counsel] was going to put on witnesses that exonerated Mr. Lopez in that regard which we would have objection to. Essentially, what has come out is that it was a white male involved. According to Miss Hatcher a number of jurors were looking at Mr. Lisle. All of this has not been lost on them, judge.

I would like to renew my motion for mistrial at this time. Additionally, a comment came out. I am sorry. I didn't mean to interrupt the Court.

THE COURT:      I didn't say anything.

MS. BLASKEY:      Additionally, a comment came out while Mr. Prince was testifying that he had information on the other homicide because of information he was privy to because of who was living in his house and Court instructed Mr. Seaton make curative attempts in that regard.

Mr. Baker [Lisle's other attorney] and I discussed this. We are concerned that the error cannot be cured, and we would object to any further efforts to clear the air because we are afraid at this point it can only make this worse. We would renew the motion, and I submit it with that.

THE COURT:      Thank you. As I understand it, based upon our conversation with you all in chambers, that you are going to both have the opportunity to cross-examine Mr. Prince and that on redirect the State will specifically ask Mr. Prince if during the time period from August of 1994 up until November of 1994 if he had other white male adults who stayed with him off and on or from time to time, and that it's my understanding his response to the question will be, yes, he did, and it will be multiple other white male adults.

I have cautioned Mr. Seaton, as you know, that he is to stay away from any type of information or even a hint of an inference that Mr. Lisle may be the unknown white male adult of whom Mr. Adams and Mr. Melcher testified about and now Mr. Prince testified about in another murder case, and, I believe, that to leave it alone would be absolutely reversible.

I don't believe in giving cautionary instructions. I believe that, in fact, would tend to make it worse than leaving it alone and that the preferable way to do this is the way that it is going to be done, and that is going to be that other than leaving the jury with the impression as they have now that the kid Adam Evans stayed over there occasionally and that Jerry Lopez and Kevin Lisle stayed there off and on for a couple of weeks, we will put multiple adult white males in that household between August and

73

1
2

November, and that is the preferable way to do it because that's the most neutral way, and that's the best way to neutralize perhaps an inference that the jury may have reached through Mr. Seaton's questioning.

3

(ECF No. 197-2 at 6-8.)

4

Subsequently, during the prosecution's redirect examination of Prince, Prince

5

testified as follows:

6
7
8

Q. [by the prosecutor]     Mr. Prince, from a couple months before August the 22nd through and including November 1994, did various white male adults stay at your house?

9

A.     Oh, yes, not only white male adults but certainly including them. I essentially had a party pad.

10

Q.     A fairly significant number of people were there on and off?

11
12

A.     At all hours. In fact, I was reprimanded a couple of times for having that.

13

(*Id.* at 41.)

14

Lisle appears to have asserted claims like those in Claims 16B and 16C, on federal

15

law grounds, in state court, on the appeal in his first state habeas action (ECF No. 188-2

16

at 47-52), and the Nevada Supreme Court denied relief, ruling as follows:

17
18
19
20
21
22
23

On direct appeal, we also considered Lisle's next argument. Lisle alleges that the district court erred by allowing the prosecutor to elicit evidence that the jury could have used to connect Lisle to another murder. Lisle's trial counsel objected and moved for a mistrial. The district court denied the motion, but diffused the problem by ordering a curative remedy. On direct appeal, Lisle argued that the district court abused its discretion by denying the motion. [Footnote: *Lisle*, 113 Nev. at 699–700, 941 P.2d at 472–73.] We concluded that the district court sufficiently cured any prejudice and properly denied Lisle's motion. The doctrine of law of the case cannot be avoided by a more detailed and precisely focused argument made after reflecting on the previous proceeding. [Footnote: *Hall*, 91 Nev. at 316, 535 P.2d at 799.] The district court properly denied relief on this ground.

24

(ECF No. 188-5 at 5-6.) On Lisle's direct appeal, it was not clear that he asserted a

25

federal-law ground for these claims (ECF No. 186-23 at 67-75), but the Nevada Supreme

26

Court's ruling on the appeal in Lisle's first habeas action indicates that the Nevada

27
28

74

Supreme Court saw itself as having denied relief on the claims on their merits, and the Court here gives effect to that ruling. Therefore, the Court addresses these claims on their merits, affording the Nevada Supreme Court's denial of relief on the claims the deference required under 28 U.S.C. § 2254(d)(1). Because the Nevada Supreme Court denied relief on these claims without discussion, this Court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington*, 562 U.S. at 102.

As the Court understands Lisle's argument, it is that his trial was unfair because the testimony of Skupa, Evans, and Prince implicated Lisle in the Logan murder, and because Prince testified untruthfully that there were many "white male adults" who "stayed" at his home, or who were "there on and off," "at all hours," during the months prior to the Logan murder. (ECF Nos. 329 at 86-89, 92-94, 186-23 at 67-75, 188-2 at 47-59.) Lisle appears to argue that the Nevada Supreme Court's ruling was an unreasonable determination of the facts, and was contrary to, or an unreasonable application of *Fry v. Pliler*, 551 U.S. 112 (2007). The Court disagrees and finds these claims to be without merit. The Nevada Supreme Court could reasonably have ruled that the testimony of Skupa, Evans, and Prince did not implicate Lisle in the Logan murder. Viewing the testimony of Skupa, Evans, and Prince in the context of the other evidence in the case, it appears the jury was unlikely to deduce that the white male adult who shot Logan was Lisle. And with respect to Prince's testimony about various white male adults spending time at his home, Lisle does not make any showing that testimony was untrue. It is true that the trial judge compelled the prosecution to elicit this testimony from Prince and that she expressed that she did not care whether the testimony was truthful or not—that being the "curative remedy" referred to by the Nevada Supreme Court. This Court does not

75

1   condone the judge's comment that she did not care if this testimony by Prince was truthful

2   or not.

3           However, there is no claim that the trial judge's comment itself violated Lisle's

4   federal constitutional rights. Moreover, the fact that the judge made that comment does

5   not necessarily mean that Prince's testimony was untruthful. Lisle has made no effort to

6   show that Prince's testimony was in fact untrue. And in the context of all the evidence, it

7   is quite believable that various white male adults spent time at Prince's home in the

8   months before the Logan murder. There is no showing that Lisle's trial was rendered

9   unfair either by the testimony that a white male adult who might have spent time at

10  Prince's home killed Logan or by Prince testifying that various white male adults spent

11  time at his home. Lisle makes no showing that the Nevada Supreme Court's denial of

12  relief on these claims was based on an unreasonable determination of the facts or that it

13  was contrary to or an unreasonable application of *Fry* or any other Supreme Court

14  precedent. Applying 28 U.S.C. § 2254(d)(1), the Court finds Claims 16B and 16C to be

15  meritless and will deny Lisle habeas corpus relief on those claims.

16          In Claim 16D, Lisle claims that, in the penalty phase of his trial, because he was

17  tried jointly with Lopez, the trial court precluded the presentation of certain mitigating

18  evidence regarding his alleged vulnerability to influence by Lopez, violating his federal

19  constitutional rights. (ECF No. 292 at 374-75.) The evidence at issue in Claim 16D is the

20  testimony of Janice Sykes, a probation officer with the San Luis Obispo County,

21  California, Probation Department. Sykes's testimony from the penalty phase of Lisle's trial

22  for the Logan murder was read into the record in the penalty phase of Lisle's trial in this

23  case because she was unavailable to testify in person. (ECF No. 198-4 at 28-39.) Sykes

24  supervised Lisle, as his probation officer, in 1988 and 1989, when Lisle was 17 to 18

25  years old. (*Id*. at 31-32.) Sykes's testimony was admitted only as it concerned Lisle, not

26  Lopez, because Lopez had not had an opportunity to cross-examine Sykes. (*Id*. at 28.)

27
                                              76
28

Sykes's testimony in the Logan murder trial mentioned Lopez, as the two were friends in California in 1988 and 1989, and Lisle had lived with Lopez for a time during those years. However, because Sykes's testimony could not be used against Lopez in this case, it was redacted to omit all references to Lopez. (ECF Nos. 198-4 at 29-39, 73-3 at 41-46.) Lisle's claim is that, therefore, because he was tried jointly with Lopez, his federal constitutional rights were violated because the following was omitted from the reading of Sykes's testimony into the record in this case:

> Q. [prosecutor]:    Okay. Was there any kind of a difficulty with this Jerry Lopez, and his living with him at that time?
>
> A. [Sykes]:    Kevin [Lisle] was ordered, as a ward of the Court, not to associate with Jerry.
>
> Q.    Jerry Lopez?
>
> A.    Correct.
>
> Q.    And had he been associating with him?
>
> A.    He had been living with him.

(ECF Nos. 198-4 at 36, 73-3 at 44.) Lisle argues that this testimony—that Lisle was ordered not to associate with Lopez in 1988 and 1989—would have been evidence supporting his alleged "vulnerability to the influence of others" as a mitigating circumstance. (ECF No. 73-3 at 29 (special verdict form, signed by jury foreperson, indicating jury did not find that mitigator).)

Lisle objected to the redaction of Sykes's testimony, and the trial court heard argument regarding the objection and then overruled it. (ECF No. 198-5 at 5-7.)

Lisle subsequently asserted this claim, as a federal constitutional violation, on his direct appeal (ECF No. 186-23 at 84-87), and the Nevada Supreme Court ruled as follows:

> Lisle presented the former sworn testimony of Janice Sykes ("Sykes"), Lisle's juvenile probation officer when he was seventeen years old, six years prior. Her testimony described Lisle's involvement with the criminal justice system when he was a juvenile. The district court redacted certain portions of the testimony relating to Lisle's relationship with Lopez. Specifically omitted was testimony that Lisle was ordered, as a ward of the

77

1

2

court, not to associate with Lopez. These statements were redacted because they may have prejudiced Lopez, whose sentence was also at issue in the penalty hearing.

3

4

5

One of the mitigating factors Lisle presented was his vulnerability to the influence of others. The jury did not find that this mitigator existed. Lisle contends on appeal that redacting the references to Lopez precluded him from presenting mitigating evidence. *See Harris v. State*, 106 Nev. 667, 671, 799 P.2d 1104, 1106 (1990) ("The sentencing body may not be precluded from considering any relevant mitigating evidence.").

6

7

8

We conclude that Lisle was not precluded from presenting evidence of his vulnerability to the influence of others. For example, his mother testified that Lisle started having problems after he became friends with Lopez and that she did not approve of their friendship.

9

10

11

12

Moreover, we conclude that Sykes' testimony is irrelevant to whether Lisle was currently vulnerable to Lopez because her acquaintance with Lisle occurred six years ago. Further, her testimony does not state that Lopez was a bad influence on Lisle; rather, it could easily be interpreted as Lisle being a bad influence on Lopez. This is especially noteworthy in light of testimony during the guilt phase that Lopez was very quiet and often not present for conversations in which Lisle participated regarding obtaining drugs or killing Justin. Accordingly, Lisle's argument lacks merit.

13

*Lisle*, 941 P.2d at 475.

14

Lisle cites the Supreme Court case of *Lockett v. Ohio*, 438 U.S. 586 (1978), as the

15

primary support for his claim. In *Lockett*, the Court stated that "the Eighth and Fourteenth

16

Amendments require that the sentencer . . . not be precluded from considering, *as a*

17

*mitigating factor*, any aspect of a defendant's character or record and any of the

18

circumstances of the offense that the defendant proffers as a basis for a sentence less

19

than death." 438 U.S. at 604 (emphasis in original); *see also Eddings v. Oklahoma*, 455

20

U.S. 104, 112-16 (1982) (reaffirming rule of *Lockett*); *Skipper v. South Carolina*, 476 U.S.

21

1, 4 (1986) (same). The *Lockett* Court added in a footnote, "[n]othing in this opinion limits

22

the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the

23

defendant's character, prior record, or the circumstances of his offense." 438 U.S. at 604

24

n.12.

25

The Court here determines that, for two reasons, the Nevada Supreme Court's

26

ruling was not an unreasonable application of *Lockett*.

27

28

78

First, a fair-minded jurist could argue, as the Nevada Supreme Court noted, that "Lisle was not precluded from presenting evidence of his vulnerability to the influence of others." *Lisle*, 941 P.2d at 475. The testimony of Sykes was offered and admitted in the prosecution's case. There is nothing in *Lockett*, or in *Eddings* or *Skipper*, or any other Supreme Court precedent as far as this Court is aware, requiring the prosecution to introduce mitigating evidence. Lisle does not show that the trial court precluded the jury from considering any mitigating evidence that he proffered. *See Lockett*, 438 U.S. at 604 (applying rule to evidence "that *the defendant proffers* as a basis for a sentence less than death") (emphasis added).

Second, a fair-minded jurist could argue that the Nevada Supreme Court was correct in its ruling that, at any rate, the omitted portion of Sykes's testimony was not relevant to the question of whether Lisle was vulnerable to the influence of others. This is because the unredacted testimony of Sykes was only that Lisle was ordered not to associate with Lopez; Sykes did not say why that was. The evidence that Lisle was ordered not to associate with Lopez does not necessarily provide any evidence that Lisle was vulnerable to Lopez's influence. As the Nevada Supreme Court put it:

> Further, her testimony does not state that Lopez was a bad influence on Lisle; rather, it could easily be interpreted as Lisle being a bad influence on Lopez. This is especially noteworthy in light of testimony during the guilt phase that Lopez was very quiet and often not present for conversations in which Lisle participated regarding obtaining drugs or killing Justin.

*Lisle*, 941 P.2d at 475.

This Court concludes that Lisle's Claim 16D fails under the AEDPA standard. The Nevada Supreme Court's ruling was not an objectively unreasonable application of *Lockett*, *Eddings*, *Skipper*, or any other Supreme Court precedent cited by Lisle.

In Claim 16E, Lisle claims that, in his joint trial with Lopez, admission of evidence of Lopez's alibi defense prejudiced Lisle. (ECF No. 292 at 375-76.) In Claim 16F, Lisle claims that, in the penalty phase of his joint trial with Lopez, his federal constitutional

rights were violated because he was denied an individualized sentencing determination. (*Id*. at 376-80.) Lisle did not assert either of these claims as grounds for relief based on federal law on either his direct appeal or the appeal in his first state habeas action. (ECF Nos. 186-23, 188-2.) In the May 6, 2022, order to show cause, the Court ordered Lisle to show cause as to why Claims 16E and 16F should not be denied as procedurally defaulted. (ECF No. 474.) In response to the order to show cause, Lisle concedes that these claims were not raised as independent claims on his direct appeal or in his first state habeas action. (ECF No. 477 at 9-10.) And in that response, Lisle made no attempt to show that he can overcome the procedural default of these claims. (*Id*.) The Court determines that Claims 16E and 16F are procedurally defaulted, and the Court will deny relief on these claims on that ground.

In Claim 16G, Lisle claims that his trial counsel were ineffective with respect to their handling of the issue of severance of his trial from Lopez's trial. (ECF No. 292 at 380-81.) In the order resolving Respondents' motion to dismiss, the Court ruled that this claim is procedurally defaulted, but that, because it is a claim of ineffective assistance of trial counsel, Lisle could possibly overcome the procedural default under *Martinez*. (ECF No. 317 at 44-45.) The claim, however, is completely conclusory. The entire claim is stated in Lisle's fourth amended petition as follows:

> To the extent that trial . . . counsel failed to raise this issue in the state courts that previously heard this matter, their defective assistance deprived Mr. Lisle of his state and federal due process and equal protection right to effective assistance of counsel . . . as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution. Competent counsel would have objected to this issue at trial . . . Mr. Lisle is entitled to relief.

(ECF No. 292 at 380-81.) Trial counsel did "object to this issue at trial," by filing a pretrial motion to sever, by moving for a mistrial based on Prince's testimony, and by objecting to the redaction of Sykes's testimony, as discussed above; Lisle does not state in his fourth amended petition what more counsel should have done. (*Id*.) Lisle did not address

this claim at all in his reply to Respondents' answer. (ECF No. 329.) The Court determines that this claim of ineffective assistance of trial counsel is insubstantial, and that, therefore, Lisle does not overcome the procedural default of the claim under *Martinez*. The claim of ineffective assistance of trial counsel in Claim 16G will be denied as procedurally defaulted.

Also, in Claim 16G, Lisle claims that "[c]onsidered singly or in combination with the other constitutional errors identified in this petition, the failure to sever Mr. Lisle's trial from that his codefendant had a substantial and injurious effect on Mr. Lisle's conviction and death sentence." (ECF No. 292 at 380.) However, as is discussed above, the Court does not find there to have been any constitutional error as alleged in Claim 16, so there are no such errors to be considered cumulatively, and this claim fails. The cumulative-error claim in Claim 16G will be denied.

### F.    Cumulative Error (Claim 28)

Claim 28 is another, more broad, cumulative error claim. In Claim 28, Lisle claims:

> Mr. Lisle's conviction and death sentence are invalid under the constitutional guarantees of due process, equal protection, effective assistance of counsel, a fair tribunal, an impartial jury, and a reliable sentence due to the cumulative errors in the admission of evidence and instructions, gross misconduct by state officials and witnesses, and the systematic deprivation of Mr. Lisle's right to the effective assistance of counsel.

(*Id*. at 455 (citing U.S. Const. amends. V, VI, VIII, and XIV).)

The Court does not in this order find there to have been any constitutional error, so there are no such errors to be considered cumulatively, and this claim fails. The cumulative-error claim in Claim 28 will be denied.

### G.    Lethal Injection (Claim 22B)

In Claim 22B, Lisle claims that lethal injection, as it would be carried out in his case, in Nevada, would violate the federal constitution. (*Id*. at 412-21.)

Respondents argue that this claim is unripe. (ECF No. 318 at 67.) The Court agrees. This claim is not ripe because it is impossible at this time to know what Nevada's lethal execution protocol will be when Lisle's execution becomes imminent. *See Floyd v. Filson*, 949 F.3d 1128, 1152-53 (9th Cir. 2020) ("We cannot determine what drugs Nevada might attempt to use to execute Floyd, and we cannot adjudicate the constitutionality of an unknown protocol"); *see also Beardslee v. Woodford*, 395 F.3d 1064, 1069-70 (9th Cir. 2005) ("[T]he precise execution protocol is subject to alteration until the time of execution"); *Thomas v. Union Carbide Agric. Prod. Co.*, 473 U.S. 568, 580 (1985) (Ripeness is "peculiarly a question of timing;" its "basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements") (internal quotation marks and citations omitted). Claim 22B will be dismissed on the ground that it is not ripe.

Lisle requests an evidentiary hearing on this claim. (ECF No. 337 at 6-7.) As this claim is not ripe—it is unknown at this time what protocol the State would use to execute Lisle—factual development of this claim at this time would be a waste of judicial resources, would cause delay in the resolution of the remainder of Lisle's habeas petition, and would generally be inappropriate. The Court will deny this request for an evidentiary hearing.

## H.    Competence to Be Executed (Claim 29)

In Claim 29, Lisle claims that his conviction and death sentence violate the federal constitution "because he may become incompetent to be executed." (ECF No. 292 at 457.) Lisle's claim, in its entirety, is as follows:

> Mr. Lisle does not, at this time, assert that he is incompetent to be executed. Mr. Lisle alleges that he may become incompetent before the execution is carried out.

> Under Ninth Circuit authority, it appears that a claim anticipating incompetence to be executed must be raised in an initial federal petition for writ of habeas corpus to be preserved for later review. *See Martinez-*

*Villareal v. Stewart*, 118 F.3d 628, 634 (9th Cir. 1997), *aff. sub nom. Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998).

Mr. Lisle hereby asserts this claim pursuant to *Martinez-Villareal* in order to avoid implication that this claim has been waived in later federal proceedings. *See* 118 F.3d at 634.

(*Id.*)

In *Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986), the Supreme Court held that it is a violation of the Eighth Amendment to execute one who is unable to comprehend that his execution is based on a conviction for murder. However, for purposes of a *Ford* claim, the determination whether the petitioner is incompetent cannot be made until an execution warrant is issued, making his execution imminent. *See Martinez-Villareal*, 118 F.3d at 630 (citing *Herrera v. Collins*, 506 U.S. 390, 406 (1993)). Claim 29 is not ripe, and it will be dismissed on that ground.

## I.    Motion for Evidentiary Hearing

In his motion for evidentiary hearing (ECF No. 337), Lisle requests an evidentiary hearing regarding his claims of ineffective assistance of trial counsel in Claims 1 and 8H, and his claim in Claim 22B that lethal injection, as it would be carried out in Nevada, is unconstitutional. As is discussed above, in Parts III.B.1., III.B.2., III.B.3., III.B.4., and IIIG, the Court determines that an evidentiary hearing is unwarranted with respect to those claims. The Court will deny Lisle's motion for an evidentiary hearing.

## J.    Certificate of Appealability

The standard for the issuance of a certificate of appealability requires a "substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c). The Supreme Court has interpreted 28 U.S.C. § 2253(c) as follows:

Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where, as here, the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a

COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir. 2000).

Applying the standard articulated in *Slack*, the Court finds that a certificate of appealability is warranted with respect to Claim 16A. The Court will grant Lisle a certificate of appealability with regard to that claim. Beyond that, the Court will deny Lisle a certificate of appealability.

## IV.    CONCLUSION

It is therefore ordered that Petitioner's Motion for Evidentiary Hearing (ECF No. 337) is treated as renewed and is denied.

It is further ordered that Claims 22B and 29 of Petitioner's Fourth Amended Petition for Writ of Habeas Corpus (ECF No. 292) are dismissed, as those claims are not ripe.

It is further ordered that Petitioner's Fourth Amended Petition for Writ of Habeas Corpus (ECF No. 292) is denied.

It is further ordered that Petitioner is granted a certificate of appealability with respect to Claim 16A of his Fourth Amended Petition for Writ of Habeas Corpus (ECF No. 292). As to all other issues, the Court denies Petitioner a certificate of appealability.

The Clerk of Court is directed to enter judgment accordingly.

DATED THIS 29th Day of August 2022.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE